# 24-1052-cv

**UNITED STATES COURT OF APPEALS**
*for the*
**SECOND CIRCUIT**

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

Plaintiff-Appellee,

V.

BERNARD FINDLEY AND HALITRON, INC.,

Defendants-Appellants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT (BRIDGEPORT)
CASE NO. 20-cv-00397-SRU

**APPELLANTS BERNARD FINDLEY AND HALITRON, INC.'S BRIEF**

Dated: August 2, 2024

**PASTORE LLC**

Joseph M. Pastore III
Leanne M. Shofi
4 High Ridge Park, Third Floor
Stamford, CT 06905
Tel: (203) 658-8454
Jpastore@pastore.net
Lshofi@pastore.net

*Counsel for Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Appellants Bernard Findley and Halitron, Inc., by and through their undersigned counsel, hereby state the following:

Bernard Findley is an individual.

Halitron, Inc. is a nongovernmental corporate party in the above-captioned appeal. There is no parent company or publicly-held corporation that owns 10% or more of Halitron, Inc.'s stock.

## **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

JURISDICTIONAL STATEMENT ........................................................1

ISSUES PRESENTED AND STANDARD OF REVIEW .......................................1

NATURE OF THE CASE ........................................................5

Procedural History ........................................................10

    Complaint and Motion to Dismiss ........................................................10

    Trial ........................................................11

    FRCP 50 Motions for Judgment as a Matter of Law .......................................21

    The Confused Jury's Verdict ........................................................22

    The SEC's Admission and Court's Misunderstanding of Liu .............................22

    At the Judgment Hearing ........................................................22

    SEC's Post-Hearing and Post-Govil Reversal of Position ..................................26

    The Judgment Appealed From ........................................................28

      a.   Six Press Releases Regarding Stock Buyback Program ............................29

      b.   Seven Press Releases Regarding Audit Status .........................................31

ARGUMENT ........................................................41

    I.   The FRCP 50 MotionS should have been granted, and No Reasonable Jury Could have found for the SEC ........................................................42

      a.   The SEC Failed to Prove Material Misstatements or Omissions ...............44

      B.   The SEC Failed to Prove Scienter .........................................................47

II.    ORDERING DISGORGEMENT AFTER THE SEC ADMITTED IT WAS "VIRTUALLY IMPOSSIBLE" TO FIND INVESTORS WAS REVERSIBLE ERROR, AS WAS BASING DISGORGEMENT ON LOANS FROM UNHARMED FINANCIERS ................................................................48

III.   THE RECORD DOES NOT SUPPORT THE CAREER-ENDING PERMANENT INJUNCTION, FOUR-YEAR BAN, OR THIRD-TIER CIVIL PENALTIES ...........................................................................52

IV.   THE DISTRICT COURT ABUSED ITS DISCRETION TO ALLOW EVIDENCE OF SCHEME LIABILITY BEFORE THOSE ALLEGATIONS WERE DROPPED AT THE END OF TRIAL, WITHOUT PROPERLY INSTRUCTING THE JURY ...............................................................54

V.  THE DISTRICT COURT'S FINDING OF FACTS NOT FOUND BY THE JURY AND/OR ORDERING PENALTIES VIOLATED APPELLANTS' SEVENTH AMENDMENT RIGHT TO A JURY TRIAL UNDER SEC V. JARKESY .................................................................................56

CONCLUSION ..................................................................................59

CERTIFICATE OF COMPLIANCE .......................................................60

CERTIFICATE OF SERVICE .............................................................61

## <u>Table of Authorities</u>

Page(s)

**Cases**

*Acticon AG v. China North East Petroleum Holdings, Ltd.*,
   692 F.3d 34 (2d Cir. 2012)........................................................................ 46

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ............................................................................... 42

*Cameron v. City of N.Y.*,
   598 F.3d 50 (2d Cir. 2010)...................................................................... 47

*Dimick v. Schidt*,
   293 U.S. 474 (1935) ............................................................................... 57

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005) ............................................................................... 46

*Gordon v. New York City Bd. of Educ.*,
   232 F.3d 111 (2d Cir. 2000)...................................................................... 2

*Harper v. Va. Dep't of Tax'n*,
   509 U.S. 86 (1993) ............................................................................. 4, 57

*In re Vivendi Universal, S.A.. Securities Litigation*,
   634 F. Supp.2d 352 (S.D.N.Y. 2009)..................................................... 47

*Liu v. SEC*,
   591 U.S. 71 (2020) ................................................................................. 38

*Mirlis v. Greer*,
   952 F.3d 36 (2d Cir. 2020).................................................................. 55, 56

*Parker v. Sony Pictures Entm't, Inc.*,
   260 F.3d 100 (2d Cir. 2001).................................................................... 56

*Reeves v. Sanderson Plumbing Prods.*, Inc.,
   530 U.S. 133 (2000) ..................................................................... 1, 42, 43

iv

*Runner v. N.Y. Stock Exch., Inc.*,
    568 F.3d 383 (2d Cir. 2009)..................................................................... 1, 42

*SEC v. Cavanagh*,
    155 F.3d 129 (2d Cir. 1998)..................................................................... 40

*SEC v. Commonwealth Chemical Securities, Inc.*,
    574 F.2d 90 (2d Cir. 1978)....................................................................... 52

*SEC v. Fowler*,
    6 F.4th 255 (2d Cir. 2021)...................................................................... 3, 4

*SEC v. Genovese*,
    17-CIV-5821 (LGS), 2022 WL 1678779 (S.D.N.Y. Nov. 7, 2022) .................... 14

*SEC v. Govil*,
    86 F.4th 89 (2023)....................................................... 2, 4, 26, 50, 56

*SEC v. Jarkesy*,
    144 S. Ct. 2117 (2024) ........................................................................ 4, 52

*SEC v. Patel*,
    61 F.3d 137 (2d Cir. 1995)...................................................................... 53

*SEC v. Shapiro*,
    494 F.2d 1301 (2d Cir. 1974)................................................................... 52

*SEC v. Sourlis*,
    851 F.3d 139 (2d Cir. 2016).................................................................... 4

*Singh v. Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019)...................................................................... 44

*Stampf v. Long Island R.R.*,
    761 F.3d 192 (2d Cir. 2014).................................................................... 47

*U.S. v. Countrywide Home Loans, Inc.*,
    822 F.3d 650 (2d Cir. 2016)................................................................. 2, 47

*United States v. Bok*,
   156 F.3d 157 (2d Cir. 1998) ................................................................. 55

*Zomber v. Christies, Inc. (In re Auction Houses Antitrust Litigation)*,
   42 F. App'x 511 (2d Cir. 2002) ......................................................... 2, 3

**Statutes**

15 U.S.C. § 77t(d) ........................................................................................ 4

15 U.S.C. § 78u(d)(3) ................................................................................... 4

28 U.S.C. § 1291 .......................................................................................... 1

28 U.S.C. § 1331 .......................................................................................... 1

**Rules**

Fed. R. App. P. 26.1 ...................................................................................... i

Fed. R. App. P. 32(a)(5) ............................................................................. 60

Fed. R. App. P. 32(a)(6) ............................................................................. 60

Fed. R. App. P. 32(a)(7)(B) ....................................................................... 60

Fed. R. Civ. P. 9(b) .................................................................................... 10

Fed. R. Civ. P. 50 ................................................................................. 21, 42

Fed. R. Civ. P. 50(a) .................................................................................. 42

Fed. R. Civ. P. 50(a)(1) .............................................................................. 47

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the case involves federal securities law claims under Section 78j(b) of the Securities Exchange Act and Rule 10b-5 thereunder. The district court entered final judgment on March 20, 2024, disposing of the case in its entirety. (A-1593-96). Appellants timely filed their Notice of Appeal on April 19, 2024. (A-1597). This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED AND STANDARD OF REVIEW

**Issue 1**: Whether the district court erred in denying a motion for judgment as a matter of law, and whether a reasonable jury could have found for the SEC, where the SEC failed to prove materiality, falsity, and scienter regarding a penny stock company's forward-looking and optimistic statements in press releases, regarding the pendency of its audit and description of its stock buyback program, which statements were accompanied by cautionary language.

**Standard of Review:** The standard to review a district court's ruling on a motion for judgment as a matter of law is *de novo*. *Runner v. N.Y. Stock Exch., Inc.*, 568 F.3d 383, 386 (2d Cir. 2009). The record should be reviewed as a whole with credit given to "uncontradicted and unimpeached evidence put forth by the moving party,' at least to the extent that that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods.*, Inc., 530 U.S. 133, (2000); accord *U.S. v.*

1

*Countrywide Home Loans, Inc.*, 822 F.3d 650, 655 n.8 (2d Cir. 2016). The standard to review a jury verdict is whether any reasonable jury could have found for the SEC on the evidence presented. *Zomber v. Christies, Inc. (In re Auction Houses Antitrust Litigation)*, 42 F. App'x 511 (2d Cir. 2002) (proper interpretation of legal precedent is a matter of law reviewed *de novo*).

**Issue 2:** Whether the District Court influenced the jury verdict by allowing the SEC to withdraw its claims of scheme liability near the end of a jury trial, after referencing scheme liability throughout trial, without explanation to the jury.

<u>**Standard of Review:**</u> Claims of error in jury instructions are reviewed *de novo.*" *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 115 (2d Cir. 2000). "An erroneous instruction requires a new trial unless the error is harmless." *Id.*, 232 F.3d at 116. "An error is harmless only if the court is convinced that the error did not influence the jury's verdict." *Id.*

**Issue 3:** Whether the District Court made an error of law and/or abused its discretion by ordering disgorgement after the SEC admitted at a judgment hearing that locating investors was "*virtually impossible*," with the SEC reversing its position only after this Court's ruling in *SEC v. Govil*, 86 F.4th 89 (2023) ("*Govil*").

<u>**Standard of review:**</u> Whether *Govil* mandated denial of disgorgement after the SEC admitted investors were "*virtually impossible*" to find at the judgment hearing is an issue of law reviewed *de novo*. *Zomber v. Christies, Inc. (In re Auction*

*Houses Antitrust Litigation)*, 42 F. App'x 511, 518 (2d Cir. 2002) (proper interpretation of legal precedent is a matter of law reviewed *de novo*). Whether the SEC's post-*Govil* submission satisfied *Govil* is an issue of law reviewed *de novo*. *Zomber v. Christies, Inc. (In re Auction Houses Antitrust Litigation)*, 42 F. App'x 511, 518 (2d Cir. 2002) (proper interpretation of legal precedent is a matter of law reviewed *de novo*). The District Court's acceptance of the SEC's reversed position after the judgment hearing is reviewed for abuse of discretion. *SEC v. Fowler*, 6 F.4th 255, 265 (2d Cir. 2021).

**Issue 4:** Whether the District Court made an error of law and/or abused its discretion by ordering disgorgement based on loans received from unharmed financiers, and not pecuniary harm to investors, where there was no evidence that loans from unharmed financiers were made because of any alleged misstatements or omissions, and the only financier to testify swore that he did *not* make his loans in reliance on alleged misstatements or omissions.

**Standard of review:** Whether disgorgement under *Govil* can be based on loans from unharmed financiers is an issue of law reviewed *de novo*. *Zomber v. Christies, Inc. (In re Auction Houses Antitrust Litigation)*, 42 F. App'x 511, 518 (2d Cir. 2002) (proper interpretation of legal precedent is reviewed *de novo*). Whether the record supports a finding that financier loans resulted from alleged misstatements

or omissions is reviewed for abuse of discretion *SEC v. Fowler*, 6 F.4th 255, 265 (2d Cir. 2021).

**Issue 5**: Whether the District Court erred in imposing third-tier civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3) against a first-time offender who consulted with securities counsel regarding the language of the allegedly misleading press releases.

**<u>Standard of Review:</u>** "Once the district court has found federal securities law violations…its choice of remedies is reviewable for abuse of discretion." *SEC v. Fowler*, 6 F.4th 255, 265 (2d Cir. 2021) (citing *SEC v. Sourlis*, 851 F.3d 139, 146 (2d Cir. 2016)).

**Issue 6**: Whether the District Court's finding of additional facts and/or ordering of civil penalties violated Appellants' Seventh Amendment right to a jury trial under *SEC v. Jarkesy*, 2024 U.S. LEXIS 2847, 144 S. Ct. 2117 (June 27, 2024) ("*<u>Jarkesy</u>*").

**<u>Standard of Review</u>**: Review of this issue of law is *de novo*. "The controlling interpretation of federal law…must be given full retroactive effect in all cases still open on direct review." *Govil*, 86 F.4th 89, n.1 (2023), quoting *Harper v. Va. Dep't of Tax'n*, 509 U.S. 86, 97 (1993).

## <u>NATURE OF THE CASE</u>[1]

This case involves (1) a start-up penny stock company growing its business through legal means, (2) an overzealous SEC that brought baseless claims based on the company's truthful, forward-looking, and/or optimistic statements accompanied by cautionary language, and (3) a judge who (i) confused the jury by allowing references to "scheme liability" throughout trial before the SEC dropped those allegations right before jury deliberations, without any instructions to the jury about the dropped allegations, and (ii) improperly found facts belonging to the jury to order third-tier civil penalties, temporary and permanent injunctions, and disgorgement, after the SEC admitted it was "virtually impossible" to identify investors.

Defendants-Appellants Bernard Findley ("<u>Findley</u>") and Halitron, Inc. ("<u>Halitron</u>") (collectively, "<u>Appellants</u>") respectfully request (1) reversal of the denial of their Motions for Judgment as a Matter of Law, (2) reversal of a jury verdict and judgment finding securities law violations despite no evidence of falsity, materiality, or scienter, and (3) reversal of a disgorgement order in violation of *Govil* and civil third-tier penalties in violation of Findley's Seventh Amendment right.

This "fraud by hindsight" case is based on forward-looking and/or truthful statements in press releases regarding the status of a financial audit and a stock

---

[1] Terms not yet defined take the meaning assigned to them below.

buyback program,[2] and the SEC failed to prove fraudulent statements or omissions, materiality, and scienter.

The District Court should have granted Appellants' Motion to Dismiss for failure to plead with sufficient particularity, but instead the case was brought to a jury, with the District Court telling the jury that the SEC alleged "an overarching *scheme* to get people to invest in Halitron and to artificially inflate its stock price." (A-271-72) (emphasis added). The SEC similarly told the jury:

> Not only were the statements in the press releases false and misleading, they were part of an *overarching scheme* to paint a false impression of Halitron, one that would attract investors so Mr. Findley kept covering debt while issuing discounted shares.

(A-285) (emphasis added). Despite the foregoing, at the end of trial the SEC *dropped* its scheme liability allegations (which the judge described as potentially confusing the jury) without explanation to the jury, thereby *actually* confusing the jury which heard about a "scheme" throughout trial with no explanation as to why that claim was not before them, and unfairly prejudicing Appellants by ascribing sinister motive to them without any evidence. The jury was tainted by accusations of a

---

[2] Because the jury found no violations in connection with a 2016 promissory note and only negligent violations in connection with a January 2018 $3 Million Promissory Note, the Judgment does not focus on the notes in its factual findings and ordering of civil penalties and disgorgement. Thus, Appellants address why reversal is required as to the alleged fraudulent statements or omissions relating to the audit and stock buyback program, because if all that remains is the negligent 17(a)(2) violation in connection with the January 2018 $3 Million Promissory Note, none of the civil penalties or findings of fraud are warranted and the Judgment must still be reversed in its entirety.

scheme throughout trial which the SEC later elected not to charge, clearly prejudicing Appellants.

The record shows no untrue statements or omissions of material fact and no evidence of scienter, and the SEC failed to meet its burden of proving securities violations by a preponderance of the evidence. No reasonable jury could have found for the SEC on the evidence presented, yet the District Court took "under advisement" motions for judgment as a matter of law. After the judge convinced the SEC to drop its scheme liability allegations before jury deliberations because it might "confuse" the jury (despite allowing the SEC to argue scheme liability throughout trial, without instructing the jury that scheme liability allegations had been dropped), the jury found securities law violations in connection with press releases relating to the company's financial audit and stock buyback program.

More than one year after the jury verdict, the District Court made its *own* findings of fact, including based on the SEC's suspicious submission *after* it had admitted at the Judgment Hearing that investors were "virtually impossible" to find ("Judgment"). (A-1564-91; A-1593-96). The District Court failed to follow *Liu* and *Govil* by accepting the SEC's reversed position and ordering disgorgement that would not benefit investors but was based on loans received from unharmed financiers. The District Court violated Findley's Seventh Amendment right by imposing third-tier civil penalties against him and issuing temporary and permanent

injunctions, unsupported by the record, which without justification destroyed Appellants' livelihood and acted as a wholly unwarranted professional "life sentence."

Since the jury verdict form did not ask for separate findings of fraudulent misstatements or omissions or materiality, over one year after the verdict the district court found facts by (i) ignoring the elements of securities laws, (ii) bootstrapping testimony from an investor who did not rely on allegedly misleading press releases to buy or sell shares (offered by the SEC to prove the "scheme liability" allegations it later dropped), and (iii) accepting the SEC's post-*Govil* reversal, after its admission that investors were "virtually impossible" to find.

The Judgment improperly suggests scheme liability and personal gains to Findley even though those allegations were dropped by the SEC and not found by the jury,[3] and cites to the testimony of an investor who, as a matter of law, was unharmed by the statements at issue, noting the jury found "fraudulent misrepresentations about the status of Halitron's financial audit (seven press releases) and its stock buyback program (six press releases)." (A-1565).

Notwithstanding that the SEC presented *no* evidence of investor pecuniary harm attributable to any alleged misstatements and *no* proof that disgorgement

---

[3] At a pretrial hearing, the Court stated: "The misappropriation theory, I think is not going to be pursued…I can grant that aspect of the motion." (A-224).

would go to investors, and notwithstanding the SEC's *post-trial* admission at the judgment hearing that it was "impossible" to find investors, the District Court accepted the SEC's post-*Govil* and post-judgment hearing *reversal* of its position to *punish* Appellants with unlawful and unjustified disgorgement, third-tier civil penalties, and permanent and temporary injunctions, unlawfully and without justification branding Appellants with professional scarlet letters and life sentences - the very punishments that the Supreme Court recently held can only be imposed by juries under the Seventh Amendment.

It was a clear abuse of discretion to accept the SEC's *reversal* of its admission made at the Judgment Hearing, submitted only after this Court's *Govil* ruling made clear that disgorgement could not be ordered. The SEC's reversal of position submission was plainly deficient, describing three investors who as a matter of law could *not* have relied on *any* of the alleged misstatements or suffered losses as a result of those alleged misstatements, because they had bought and sold shares when publicly available information was unchanged. One investor held shares for just one day and the second investor for just eleven days, when no public information had changed. Yet the District Court improperly reached beyond the jury's findings to find additional facts, misconstrue the evidence, and ignore precedent to order disgorgement based on monies received by unharmed financiers and to impose *third-tier penalties* in violation of Findley's Seventh Amendment right, and to impose

temporary and permanent injunctions forever scarring Appellants. The Judgment must be reversed, or at a minimum vacated for a new trial.

## **Procedural History**

### ***Complaint and Motion to Dismiss***

The SEC alleged that Appellants issued false and misleading press releases "to attract entities ('financiers') who provided funding to Halitron in exchange for discounted shares of Halitron stock." (A-20). The Complaint grouped alleged misstatements into four categories: (1) "financing," (2) "financial audit," (3) "stock buyback program," and (4) assets, made in ten press releases between July 7, 2016 and April 25, 2018. (A-20-31).

Appellants moved to dismiss because the Complaint failed to meet the requirements of FRCP 9(b), identifying only dates of press releases and summarizing what the press releases said, requiring dismissal. (A-53). Appellants also noted the Complaint failed to explain why the statements were false or misleading, and did not properly allege facts to show "that defendants had both [the] motive and opportunity to commit fraud" or "strong circumstantial evidence of conscious misbehavior or recklessness." (A-51; A-53).

Appellants explained that the statements regarding the financial audit and stock buyback program were truthful and/or could not have been materially misleading because they were optimistic and/or forward-looking statements

accompanied by cautionary language. (A-56). For example, press releases from October 30, 2017 and April 25, 2018 stated that "Halitron's management and board of directors had agreed to allow the company to engage in a stock buyback program," which was *true*. The Complaint even *acknowledged* that Halitron repurchased stock, but took issue with the *scope* of the repurchases notwithstanding that no representations had been made about the *scope* of the buyback. (A-58). The District Court denied the Motion to Dismiss. (A-103; A-111-12).

### *Trial*

Trial was held in January 2023. (A-1564). The SEC called Findley as a witness, who testified that the press releases had been vetted with securities counsel, additional information had been disclosed in OTC Markets Disclosures, that the financings causing dilution were necessary to bring value to shareholders, that at the time of the press releases he had been told that the audit was nearly complete, that Halitron was buying back stock on the open market, and that acquiring revenue-generating Hopp Companies in August 2017 was intended to and did bring value to shareholders. (A-97; A-331-32; A-337; A-412; A-468-69; A-483; A-519-20). Findley's testimony was fully corroborated by documentary evidence and unbaised testimony from securities counsel and a financial consultant. (A-974-75; A-1070-74; A-1314-15).

Documentary evidence and uncontroverted testimony proved that Halitron paid $100,000 to Friedman for the audit, pursuant to a second invoice dated April 7, 2017, through a 3(a)(10) financing made public to investors in a filed 8-K. (A-491-92). Documentary evidence and uncontroverted testimony confirmed that as of October 2, 2017 a 10-K had been drafted, finalization of which required that the audit be complete. (A-304-05; A-1265-1313).

Uncontroverted testimony from Appellants' securities counsel *and* financial advisor, as well as from Findley, proved that press releases were vetted by securities counsel and the financial advisor before they were released, and that details about capitalization and the stock buyback program were disclosed in OTC Markets Disclosures. (A-97; A-331-32; A-337; A-412; A-468-69; A-483; A-519-20).

In questioning Findley, the SEC suggested that the statement "*Halitron has begun to buy back shares in the open market*" in a January 22, 2018 press release was somehow misleading, despite the fact that Halitron *had* begun to buy back shares, with the amount and price disclosed in OTC Markets Disclosures:

> Q: And, in fact, you had bought $800 worth of stock on December 22, 2017, right?
>
> A: That is correct.
>
> Q: You didn't tell shareholders in this press release the amount of the buyback in December, did you?
>
> A: No. We listed in our disclosures at OTC Markets.

12

\*\*\*

> Q: You also didn't tell shareholders how many shares the
> company bought back with that $800, correct.
>
> A: That is correct. But they know the price range at that
> point in time, and we also disclose it on a quarterly basis
> at OTC Markets.

(A-331-32). In other words, the January 22, 2018 statement that "Halitron has begun

to buy back shares in the open market" was absolutely true.

Findley testified: "*I don't say anywhere in any of the press releases that the

share price is going up the next day to a penny, the next week, the next month, the

next year.*" (A-327). Findley described the stock buyback pursuant to SEC guidance

as a "*long-term program*." (A-327-28). Findley explained why he purchased the

revenue-generating Hopp Companies for Halitron's investors, which was not the

subject of the SEC's allegations but did require the issuance of additional shares to

pay for the companies (requiring dilution in value of outstanding shares):

> The 3(a)(10) transaction, when I bought Hopp Companies,
> I took possession of a company. I had to pay for that
> company by issuing between 14 and maybe 22 billion
> shares on that one day in August, court ordered approved
> settlement agreement that was outlined by the SEC, 14 to
> 22 billion shares. And the finance company pulled those
> shares through during that period of time. So I had to issue
> these shares to pay the company….

(A-338).

13

In other words, the dilution in value that some shareholders complained of was legal and had been disclosed and was not alleged to be wrongful by the SEC, yet the SEC alleged that statements about the stock buyback program and audit status were misleading. The SEC produced *no* evidence at trial that debt financiers loaned money to Halitron because of alleged misstatements or omissions in press releases, with the only debt financier to testify ("Donaldson") swearing that he did *not* loan money to Halitron because of its press releases and was *not* interested in disgorgement. (A-1440-41).

The SEC called only one investor – Gary Tas – at trial, after the District Court denied Appellants' motion *in limine* to preclude Tas' testimony as prejudicial ("Tas").[4] Tas testified he *made* money investing in Halitron in 2016 because "…I saw enough what I thought was going to be growth in that very small company that it -- I was willing to, you know, take a shot at investing in a penny stock." (A-831). Tas admitted Halitron was:

> …. at the lowest tier, which is called an OTC pink sheet. And that is the very bottom line. That's where the entrepreneur pretty much starts at a point where they need some money or capital from the investment community to

---

[4] The SEC offered Tas' testimony to prove *materiality* and "*something extra*" required for scheme liability, despite dropping scheme allegations at the end of trial. (A-241-43). Appellants objected to Tas' testimony as not probative and because any probative value was "substantially outweighed by the risk of prejudice from jury sympathy for investors." (A-239, *quoting SEC v. Genovese*, No. 17-CIV-5821 (LGS), 2022 WL 1678779, at *1 (S.D.N.Y. Nov. 7, 2022)). The District Court ruled Tas could testify, stating: "I'm not sure it goes so much to materiality as it does to state of mind…." (A-249).

> try and grow their invention, their product, their service,
> whatever they're pursuing, versus a loan.

(A-833).

Although Tas testified that he generally relies on press releases when trading, his testimony made clear that his trading in Halitron was *not* tied to the press releases alleged to be materially misleading, such press releases more interesting to him as an existing investor.[5] Tas admitted that whether Halitron received financing (which it did, resulting in dilution) was "absolutely" important to him, because Halitron was a "small company just starting out." (A-834).

Tas admitted he *made* money trading Halitron in 2016, with no relation to the 2016 press release relevant to the SEC's allegations (as to which the jury found no securities violations). (A-854-55). Tas admitted that he traded in other penny stocks and knew it was "risky." (A-858). Tas testified that before he made his "big" purchase of Halitron shares on June 6, 2017, he already knew about the stock dilution related to debt financing and that the audit was still pending. (A-864-65; A-869). He also testified that he bought more shares in March 2018 "to average down." (A-869-70). Tas even testified that not only was he well aware of the stock dilution when he

---

[5] The Judgment improperly cites Tas' testimony that he generally follows press releases to support its finding that Tas "was one individual who bought Halitron stock in reliance on Findley's fraudulent statements." (A-1574). That erroneous characterization of the record ignores Tas' admissions and trading history, which make very clear that his purchases were *not* based on press releases regarding the audit or stock buyback program; Tas' trades in reliance on press releases regarding promissory notes are irrelevant, given the Jury's finding no violation in 2016 and only a negligent violation in 2018.

purchased more shares, but that he had discussed the issue with other investors on iHub. (A-867-70).

Tas admitted that after making money on Halitron stock in 2016, he purchased more shares between October 16, 2016 and January 18, 2017 because "the price had decreased so much." (A-864). He testified:

> Q. And you continued to make purchases from October 6, 2016, through January 18, 2017, correct?
>
> A. Correct, with the idea that there weren't a lot of money involved because the price had decreased so much.
>
> Q. Sure. So all of those purchases from fall 2016 to January 2017, to state the obvious, were before the May 11, 2017, press release that the SEC showed you, right?
>
> A. Right.

*Id.*

> Q. So, again, Mr. Tas, your next purchase of Halitron stock was June 6, 2017, right?
>
> A. Yeah. That was a big one.
>
> Q. And that was after you spoke to Mr. Findley, right?
>
> A. Correct.
>
> Q. Okay. At this point when you made that purchase, you knew that Mr. Findley was diluting Halitron stock, right?
>
> A. I did.
>
> Q. You knew it was part of his business strategy, right?

16

A. I did.

Q. You knew he was using Halitron stock as currency to further the business endeavors, right?

A. I did.

(A-864-65). Tas was a disgruntled long-time investor, whose testimony established that he did *not* buy or sell pursuant to allegedly misleading press releases but based on lowered share price, who at the time of his "big" purchase knew about stock dilution and the delayed audit. Tas' testimony about a phone call with Findley about Halitron's "prospects" was irrelevant to statements about the stock buyback and audit in press releases, and fully irrelevant once the SEC dropped scheme liability allegations.

While the SEC presented some documentary evidence of disgruntled investors messaging the "info" email address for Halitron and on LinkedIn, most of those communications were from anonymous "LinkedIn Members" or generic names such as "SimplyUptrend Stocks," expressing displeasure as existing investors but *not* asserting that they purchased shares as a result of the press releases. (A-1316-39). The SEC did not have any of those investors testify at trial.

In contrast to the dearth of evidence presented by the SEC, Appellants presented as witnesses a seasoned securities law attorney and a financial consultant who worked closely with Appellants during the relevant time period and in connection with the press releases and the audit.

17

Bruce Harmon, a financial consultant who worked with Appellants ("Harmon"), testified that as of December 2017 "the financials were complete" (A-972) and that the "Form 10-K had been prepared" (*Id.*) and that:

> …. Mr. Van Fleet of Friedman and I both had independently called the SEC to inquire exactly how to report eight years of financials, because this is an abnormal situation. And we both ended up with the exact same advice. And we – according to my full documents, Mr. Van Fleet had gone through the entire 10-K and provided edits through the entire 10-K, edits which is normal and customary when you're preparing a 10-K.

(*Id.*). Harmon also testified that he did not identify any red flags in connection with his financial work for Halitron. (A-973). Harmon testified that Appellants "were poised and ready at all times" to provide additional backup or supporting documents or explanation, and that "they devoted all efforts necessary to facilitate" the audit and that Findley was "absolutely" responsive to his requests about the audit. (A-974-75).

Regarding an email dated July 7, 2017 (A-1314-15), Harmon explained:

> At this point it appeared that Friedman was dragging this audit out longer and longer, and it was getting very frustrating at this point as I have done probably 200-plus audits and I have never seen one like this that just dragged on and on. And for them to come back and just ask silly questions *when we're almost done*, which this was a very, very silly question, because what they were saying was out of balance was 100 percent incorrect.

18

(A-975-76) (emphasis added). To repeat: Harmon testified that by July 7, 2017 the audit was "almost done." (*Id.*). In that same email chain, Findley wrote to Harmon and Friedman: "*I was told 'two weeks and we wrap this up*,'" (A-1314) (emphasis added), evidencing that Findlay had been told by the auditor that he had earlier been told "two weeks and we wrap this up," and as Harmon further testified: "I had discussed with Justin and *knew we were almost done*…and I had copied Justin Van Fleet and it said *we were 98 percent complete*." (A-977) (emphases added).

Lance Brunson, a securities attorney who has practiced securities compliance for many years ("<u>Brunson</u>"), testified that in representing clients he, among other things, wants to know that his clients' "intent is to comply with the regulatory regime that they're under, that they're not trying to skirt the law," and that he would not represent someone he believed to be unethical. (A-1065).

Brunson testified that he met Findley through Harmon back in 2016, and assisted Halitron with several disclosure documents filed with the SEC "in connection with financing transactions, as well as an acquisition that took place later in 2017." (A-1068-69). Brunson testified he spoke frequently with Findley and:

> We spoke with Mr. Harmon frequently in connection with the status of the financial statements that were being prepared in connection with both Hopp and Halitron and the audit that was taking place.

(A-1069) (emphasis added). Brunson testified:

> The goal of the issuer was to become a mandatory SEC reporting company. So the objective was always for a Form 10 Registration Statement to be filed. And as part of that process, the company would need to complete a two-year audit of its financial statements.
>
> As well, there was some question whether Halitron, whether the predecessor to Halitron, the public company, a company by the name of Teknik Digital, whether it had properly filed what's called a Form 15 with the SEC. So Halitron previously was a full SEC reporting company up through 2014-ish when it filed the Form 15 with the SEC.

(A-1070).

Brunson testified that he spoke with the auditor Friedman on behalf of Appellants, and that "after the Hopp acquisition had been closed, there were a number of kind of new answered accounting questions that we were assisting Mr. Harmon with answering." (A-1071). Brunson confirmed that there was actually an audit being performed (*Id.*) and testified: "we understood that the auditors were working through essentially establishing what the trial balance would be and what the financial impact of the Hopp acquisition would be on Halitron going forward;" Brunson said he had never seen an audit take that long without an audit report being issued. (A-1072).

Brunson also testified that he reviewed press releases for Appellants and that his review of press releases never raised any red flags. (A-1073). Brunson explained:

> And so we would review a press release, and if we saw any language that we thought was, you know, hyperbolic or, you know, exaggeratory, then we would, you know,

20

> issue a comment, Hey, is this supportable; is this
> verifiable; this doesn't quite seem right.

(A-1074). Brunson never flagged language about the audit or stock buyback program

as problematic. (A-1073).

Brunson also explained that on October 20, 2017 he emailed Findley to

confirm his questioning another attorney about how to announce the stock buyback

program, and Brunson assured Findley: "Yes, a PR announcing the program and

lining up the broker is all that's necessary." (A-1075-76; A-1338-40).

Just before trial concluded, the SEC withdrew its scheme liability allegations,

which the Court described as potentially confusing, without any instruction to the

jury:

> THE COURT: So I appreciate the Commission
> withdrawing the *potentially confusing* and duplicative
> claims. That was done not as a matter of law and not
> entirely voluntarily by the Commission. The Commission,
> I think, thankfully responded to *fairly strong pressure
> from me to make that decision.*

(A-1060) (emphasis added).

### ___FRCP 50 Motions for Judgment as a Matter of Law___

Appellants moved for Judgment as a Matter of Law pursuant to FRCP 50 on

January 12, 2023 and again on January 13, 2023, because no reasonable jury could

have a legally sufficient evidentiary basis to find for the SEC. (A-1049; A-1199).

The District Court took those motions "under advisement," the jury verdict was

entered on January 17, 2023, and thereafter the Motions for Judgment as a Matter of Law were denied without prejudice. (A-1050-51; A-1200-01; A-1377).

### *The Confused Jury's Verdict*

The Verdict Form filed on January 17, 2023 was 2.5 pages long, did not list the language of the alleged misstatements, and did not require separate findings for the elements of falsity or materiality. (A-1374-76). The jury found no misrepresentations in connection with a July 2016 Promissory Note, only negligent Section 17(a)(2) violations in connection with a January 2018 Promissory Note, and 10(b) and 17(a)(2) violations in connection with *collective* press releases regarding the financial audit and stock buyback program. (*Id.*).

### *The SEC's Admission and Court's Misunderstanding of Liu At the Judgment Hearing*

Nearly ten months after the jury verdict, the judge held a hearing on the SEC's Motion for Entry of Final Judgment ("Judgment Hearing"). (A-1485-532). At that hearing, the weakness of the SEC's case and wrongfulness of its sought penalties were laid bare, as was the lower court's misunderstanding of *Liu*. Regarding its requested order of disgorgement and the Supreme Court's requirement in *Liu* that disgorgement be for the "benefit of investors," the SEC admitted that not only had it gone "*to extremely great lengths to find an investor to testify at trial,*" but that it would be "*virtually impossible*" and "*infeasible*" to identify investors:

THE COURT: All right. And then turning to disgorgement, why has the SEC not proposed a plan for distribution of profits that are disgorged to go to investors? *Presumably, you have the identity of these investors.*

MS. COOKE: I think that that's the issue here, Your Honor, is that *we don't have the identity.* There are so many. There are thousands and thousands of microcap investors for which the identity is unknown. *We tried. We went to extremely great lengths to find an investor to testify at trial. It only happened upon us that we were able to find Mr. Tas. And the same issue presents itself with finding a group of individuals to be able to return the money to the microcap market….*[i]t *would be virtually impossible to figure out…*" (p. 12) (emphases added).

***

MS. COOKE: ….I suppose there's a world in which we could get it posted on the OTC website. I'm not entirely sure how that works. And then to say nothing of the cost to set up such a fund would likely dwarf the amount that we recover…. *So it makes it infeasible in that regard as well, just not cost effective.*

(A-1497) (emphases added).

Because the SEC had not presented evidence of investor pecuniary harm tied to allegedly misleading statements, the District Court suggested it could order disgorgement based on *loans* Halitron received from *unharmed financiers*, which Appellants' counsel explained violated *Liu*:

MR. DEVER: ….The *SEC is seeking disgorgement of the proceeds from loans from what they call the debt financiers, primarily our defense witness, William Donaldson, and what they're doing is overlapping the total amount of those loan proceeds with the date in which the ten press releases they challenged were issued* and *this is not an offering fraud cause. This is not a situation where*

23

> the debt financiers were misled by Mr. Findley or he lied
> to them and they parted with their money….Nor is this a
> pump and dump case. *This is not a situation where Mr.*
> *Findley issued press releases, falsely misleading press*
> *releases, and it ran up the price of the stock.* Their own
> witness showed that *there was no real effect, appreciable*
> *effect, on the stock price from the press releases.* Nor is
> this a situation where Mr. Findley sold his shares of stock
> into the market at artificially high prices….
>
> ***
>
> THE COURT: …. *I tend to agree with you*, it seems that
> the theory here is that this money was obtained wrongfully
> and *I think the easiest solution to that is to disgorge the*
> *balance to the folks who provided it.*

(A-1502-03) (emphases added). The foregoing illustrates that the District Court did

not understand *Liu*, stating "*I tend to agree with you*" yet that it would be the "*easiest*

*solution*" to order disgorgement of loan monies received from unharmed financiers.

The District Court also recognized that Donaldson, the only financier who testified,

had not relied on the press releases and "*essentially disclaimed any right, if you will,*

*to disgorgement.*" (A-1504) (emphasis added).

Appellants' counsel explained that this was why the SEC had not met its

evidentiary burden, because it had not put any debt financiers on the stand and only

had identified one investor, and that "*there's no causal connection or link between*

*these other debt financiers and the false statements in the press release,*" with the

Court acknowledging same by responding: "*they can still do that, can't they? If I*

*find facts that support disgorgement, I can base it on post-trial evidence.*" (A-1504;

A-1506).

24

Appellants' counsel reiterated: "[t]he SEC acknowledges that they are not seeking disgorgement for the benefit of investors under the Supreme Court's *Liu* test," (A-1507-08), with the judge further revealing his bias against *Liu*:

> THE COURT: *It seems the law has developed in a strange way, frankly, to add on a requirement that it has to be for the benefit of investors. That's a judge-made rule that I'm not sure makes a lot of sense*….
>
> The burden, though, I think on the SEC is not especially heavy because we have – the evidence at trial certainly is that there are many, many investors and purchasers of the stock and if those are the folks who are the missing plaintiffs, *that seems to be pretty infeasible, but the reason I'm getting at the folks who loaned money to Halitron is it seems to me that is a more manageable group*…and why it would be difficult or infeasible to have the disgorged profits go to them.

(A-1509-10; A-1512) (emphases added). To reiterate: the judge *admitted* at the Judgment Hearing that he did not think *Liu* made "a lot of sense," and acknowledged that in this case disgorgement to investors was "pretty infeasible." (*Id.*).

Also at the Judgment Hearing, the judge indicated that he would need to find facts that the jury had not found:

> THE COURT:….So the question really is: *Is it clear that I can make findings of fact that are not inconsistent with the jury's verdict*?
>
>                      \*\*\*
>
> My question is really am I bound by *or is my role to predict or understand or assume what the jury thought*, or having gotten a liability determination from the jury, *do I*

*now become the fact finder for purposes of injunctive relief, and that role, I assume, is not one where I am predicting or assuming, et cetera, what the jury must have had to whatever thought.*"

MS. COOKE: …. *we are necessarily, I think, relying on Your Honor's interpretation of the factual record as it came in, but it does at least provide a guide of what the jury was thinking when they were the fact finder.*

THE COURT: Okay. But again, you're tying it back to the jury. *So the question is really am I free to find facts or has the SEC waived factual determinations by not giving me proposed jury interrogatories?*

(A-1491; A-1493) (emphases added). In sum, the judge recognized he was being asked to find facts *beyond* those found by the jury, illustrating that the SEC failed to meet its burden and also violating the Seventh Amendment as confirmed by the Supreme Court in *Jarkesy*.

### *SEC's Post-Hearing and Post-Govil Reversal of Position*

After the Judgment Hearing, this Court decided *Govil* on October 31, 2023, making clear that under *Liu* disgorgement could not be ordered upon the SEC's lack of evidence and admission that investors were "virtually impossible" to find. *Govil* confirms that under *Liu* "disgorgement must be 'awarded for victims.'" *Govil*, 86 F.4th at 94.

Two weeks after *Govil*, after the SEC's admission that investors were "*virtually impossible*" to find, and after the judge admitted he did not believe *Liu* made sense, the SEC reversed its position by submitting a declaration of employee

Nicolas C. Lopez purporting to describe investors who purchased Halitron shares ("Lopez Declaration"). (A-1555-61). The Lopez Declaration describes three investors who, as a matter of law, could not have been harmed by the alleged misstatements, and asserts that 2,967 retail investors traded with losses during the Relevant Period, *but those losses likely had no causal connection to the supposedly misleading press releases, with no evidence of when trades occurred or if publicly available information had changed*. (A-1559). The trades of only three investors were identified in the Lopez Declaration, with two trading in such a short timeframe that publicly available information *had not changed* and the third holding a majority of its shares after the Relevant Period had ended. (A-1559-60).

The first investor suddenly "identified" after *Govil* and ten months after trial held his shares for *just 11 days*, buying on January 22, 2018 and selling on February 2, 2018, during which time there were *no* allegedly misleading press releases and the publicly available information remained unchanged (one press release was on January 16, 2018, the next on February 28, 2018). (A-1559). That investor realized a $200 loss, as a matter of law attributable to factors *other than* the press releases.

The second investor suddenly "identified" after *Govil* and ten months after trial sold just 2 million of his 12 million shares, with no purchase or sale dates identified, for a purported loss of $1,300 and that investor still holding most of its shares after April 25, 2018. (*Id.*).

The third investor suddenly "identified" after *Govil* and ten months after trial held his shares for *just one day*, buying on January 23, 2018 and selling on January 24, 2018, during which time publicly available information remained unchanged. That third investor realized a $17 loss, which as a matter of law (and logic) cannot be attributed to the press releases.

Thus, *none* of the three investors suddenly "identified" and specifically described by the SEC after *Govil* and ten months after trial suffered losses that could be attributable to the press releases. The SEC's post-*Govil* and post-trial reversal of its admission should have been rejected.

### ***The Judgment Appealed From***

Over one year after the Jury Verdict, in a February 21, 2024 decision and March 20, 2024 Judgment ("Judgment"), the District of Connecticut (Underhill, J.) acknowledged that "the jury was not asked to determine on a statement-by-statement basis which of the seven audit press releases and six stock buyback press releases were false and misleading." (A-1565). The judge then made those factual findings himself: "I find that each of Findley's statements about the audit and stock buyback was false and misleading and made with scienter."[6] (*Id.*). The Judgment went far

---

[6] The District Court noted that since "the jury found that Findley acted negligently with respect to a single press release concerning a purported $3 million promissory note, I need not engage in a statement-by-statement analysis for that press release." (A-1565 n.1).

beyond the jury's findings, even going so far as to make findings clearly based on the SEC's dropped allegations of scheme liability and personal gain.

### a. *Six Press Releases Regarding Stock Buyback Program*

The judge found that "[b]etween October 30, 2017 and April 25, 2018, Halitron issued six press releases concerning a stock buyback program." (A-1566). Those press release dates and statements were as follows:

- October 30, 2017: Headlined "Halitron, Inc. Announces Stock Buyback Program" and "Board Approves Stock Buyback in the Open Market up to $0.01 per share" – states that Halitron "today announced that the Board has approved a stock buyback of Halitron's common shares in the open market up to a stock price of $0.01" (A-1242).

- November 10, 2017: Headlined "Halitron, Inc. Announces Preliminary Third Quarter Revenue Data" and "Recent Acquisitions Boosting Sales, Generating Cash Flow for Share Repurchase" – states that Halitron "now realizing a positive cash flow, and as previously announced, this will be utilized to buy back shares in the open market excluding the following blackout periods." (A-1245).

- January 22, 2018: Headlined "Halitron, Inc. Announces Conversion of Preferred Stock Into a $3M Shareholder Asset," and "Improves security position by booking long term debt instead of equity" – in addition to describing the LTCP deal *and* that the acquisition of Hopp Company's assets to Halitron's infrastructure was "very successful thus far" *and* forecasting that operating expenses should decrease dramatically after transitioning to a new facility in New Hyde Park, NY *and* that management is planning to utilize previously acquired assets PiecesInPlaces and CinchSigns within Halitron's infrastructure, the release states that "Halitron has begun to buy back share in the open market according to the 'black-out' periods disclosed in its filing to OTC Markets with the objective to increase its share price to $0.01 per share" (A-1249).

29

- February 6, 2018: Headlined "Halitron, Inc. Streamlines Operations with Relocation of Manufacturing" – states that "[r]ecent cash flows from operations have primarily been allocated to relocating the business and the build-out in Connecticut; however, Management has allocated funds for two purchases of Halitron common stock in the open market." (A-1251).

- February 28, 2018: Headlined: "Halitron, Inc. Reports $724,000 in sales for FY 2017 and $407,000 in Q4 2017 Alone – After language about the "[s]ignificant increase in revenue due to the acquisition of The Hopp Company Assets on August 18, 2017," there are seven bullet points, and in the second to last bullet point: "*Management has begun to and is committed to acquiring additional shares back in the open market to help support an increase in share price, of up to $0.01 per share. This is done in an effort to meet one of the qualifying factors of an up-list to the OTCQB*" (A-1254) (emphasis added).

- April 25, 2018: "currently engaged in a share buyback program" (A-1258).

Each of the above press releases included safe harbor language.[7]

Ignoring uncontroverted testimony that the stock buyback program was "long-term," (A-327-28), and ignoring that the alleged misstatements did not mention the timing or scope of the program, (A-1242; A-1245; A-1249; A-1251; A-1254; A-1258), the judge found the above statements fraudulent because only four buybacks occurred during a seven-month period (December 2017, January 2018, and June and July 2018) to "buy back less than 15 million shares—'an extremely small

---

[7] Each Safe Harbor Statement was identical or similar to the following: "Safe Harbor Statement. The information posted in this release may contain forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. You can identify these statements by use of the words "may," "will," "should," "plans," "expects," "anticipates," "continue," "estimate," "project," intend," and similar expressions. Forward-looking statements involve risks and uncertainties that could cause actual results to differ materially from those projected or anticipated. These risks and uncertainties include, but are not limited to, general economic and business conditions … and various other factors beyond the Company's control." (A-1233).

percentage' of the number of shares outstanding." (A-1566). Ignoring that investors were already complaining about stock dilution from shares issued to debt financiers, the judge found the press releases materially misleading because "none of the six press releases concerning the stock buyback program disclosed the billions of discounted shares issued to debt financiers or even that any shares were issued at all." (*Compare* A-1329; A-1331; A-1333 *with* A-1567).

### b. Seven Press Releases Regarding Audit Status

The Judgment states that "[b]etween May 12, 2017 and April 25, 2018, Halitron issued seven press releases concerning a financial audit of Halitron," citing:

- May 12, 2017: Headlined "Halitron, Inc. *Anticipates* Completion of the Audit to become an SEC Fully Reporting Company," and stating that Halitron "*expects* to be a Securities and Exchange Commission reporting public company with the completion of its audit in May-June 2017, and filing of its delinquent Annual Reports on Forms 10-K in June-July 2017," and that "we are *still on path* to becoming a fully reporting SEC, audited OTCQB traded company by mid-year" (A-1233-34) (emphases added).

- July 18, 2017: Headlined: "Halitron, Inc. Sells Two Brands in $3+ Million Deal – To Issue Dividend – in the fourth paragraph, after language about the headlining Deal and Dividend, the release states: "As previously reported, Management *anticipates* completing the audit shortly and preparing and filing a Super Form 10-K with required disclosures dating back to 2008 shortly thereafter, at which time HAON will become a reporting Pink Sheet OTC Market company" (A-1235-37) (emphasis added).

- July 24, 2017: Audit process "almost complete" (A-1238-41).

- December 11, 2017: "Management *expects* the 2017 audit to be completed during the early part of 2018" (A-1247-48) (emphasis added).

31

- January 22, 2018 – Headlined "Halitron, Inc. Announces Conversion of Preferred Stock Into a $3M Shareholder Asset," and "Improves security position by booking long term debt instead of equity" – in addition to describing the LTCP deal *and* that the acquisition of Hopp Company's assets to Halitron's infrastructure was "very successful thus far" *and* forecasting that operating expenses should decrease dramatically after transitioning to a new facility in New Hyde Park, NY *and* that management is planning to utilize previously acquired assets PiecesInPlaces and CinchSigns within ***Halitron's*** infrastructure, the release states that "The audit work is under way and is ***expected*** to complete in the first half of 2018 with the objective to uplist to the OTCQB" (A-1249-50) (emphasis added).

- February 28, 2018 - Headlined: "Halitron, Inc. Reports $724,000 in sales for FY 2017 and $407,000 in Q4 2017 Alone – After language about the "[s]ignificant increase in revenue due to the acquisition of The Hopp Company Assets on August 18, 2017," there are seven bullet points, and in the very last bullet point the release states: "A US GAAP audit, another qualifying factor for the uplist to the OTCQB *will commence quickly as the relocation of the HOPP assets is now nearly complete. Management will provide an update over the coming weeks on a more precise timeline on its completion.*" (A-1254-56) (emphasis added).

- April 25 2018 – "re-engaged Friedman LLP to complete the 2017 audit [and Friedman] will continue to finalize the project through September 30, 2017 over the coming months" (A-1257-59).

(A-1567; A-1233-41; A-1247-50; A-1254-59). Each of the cited press releases contained Safe Harbor Statements.[8]

Ignoring clear evidence that the audit *had* commenced at the time of the statements, with Friedman paid $100,000 by June 6, 2017, and uncontroverted evidence that the audit *was* almost completed at the time of the statements and that Appellants were told prior to May 12, 2017 that the audit was near completion, the

---

[8] *See* note 7, *supra*.

Judgment erroneously found the May 12, 2017 press release fraudulent because: "Findley knew that (a) Friedman had not started substantive work on the audit as of May 16, 2017, (b) the project was substantial, requiring the preparation of nine years of audited financials, and (c) the auditors thought Halitron's financial records were in poor condition for conducting an audit." (*Compare* A-491-92; A-976-77; A-1072 *with* A-1567-68). In support of the foregoing, the Judgment cites insufficient evidence and/or evidence out of context.

Harmon testified that as of July 7, 2017, his and Findley's understanding "from prior discussions" with Friedman was "*we were getting near the end…almost done…98 percent complete…almost complete…told that we were almost done.*" (A-976-77). Harmon testified that the SEC's implication that "this was the beginning of an audit" was "totally incorrect. *This is the end of the audit*." (A-1013) (emphasis added).

The Judgment erroneously finds the "July press releases concerning the audit" misleading because they "did not disclose that there was a long list of open items still required by Friedman to proceed with the audit," ignoring uncontroverted testimony that the August 2017 acquisition of Hopp Companies to benefit investors necessarily increased the scope of the audit. (*Compare* A-1071-72 *with* A-1568). The Judgment ignores documentary proof that at the time Findley was pressuring the auditor to *finish* the audit, myopically focusing on a complaint to the auditor that

33

there was "no end in sight" which Harmon explained was Findley's frustration after they were told in July 2017 that they were "ne*ar the end*," "*almost done*," and "*98 percent complete*." (*Compare* A-1568 *with* A-976-77).

The Judgment ignores the jury findings and the SEC's dropping scheme liability and personal profit allegations to improperly find a "pattern of issuing recurring, false and misleading press releases on the same subjects was designed to create investor demand for Halitron's stock." (A-1570).

The Judgment emphasizes that stock promoters had been hired and there was an increase in trading volume after press releases, ignoring that the press releases addressed various issues relating to Halitron's business and contained many statements other than those alleged to be fraudulent, including positive headlines about selling two brands in a "$3+ Million Deal" and issuing a dividend and reporting significantly increased revenue due to the acquisition of The Hopp Company assets on August 18, 2017 - *none* of those subjects, logically more likely to increase trading volume than an audit timing update or announcement of a stock buyback program, were the subject of the SEC's allegations. (A-1571).

The Judgment makes much of Findley's testimony that "[e]very company needs investors buying stock" and "[y]ou need an active stock market to receive debt financing as a public company" - truisms for any public company, and the SEC alleged no wrongdoing in connection with the debt financings. (A-1572-73, citing

A-422-23). The Judgment bootstraps Halitron's receipt of $298,000 from debt financings to improperly find - well beyond the jury's findings and apparently based on the SEC's dropped allegations - that Findley "used this money largely for his own benefit or to perpetuate the fraud by paying for additional stock promotion activities." (A-1573). Findley only "drew a salary" and "paid [himself] back expense reimbursement" from July 2016 to April 2018, and there was no evidence that he improperly used the debt financings. (A-313-14).

The Judgment acknowledges that $75,000 of the loaned funds were from Donaldson who swore that his decision "was not based on any public statements Defendant Findley made in Halitron press releases relating to the Financial Audit, Stock Buyback Program, or the $3 Million Promissory Note." (A-1573 citing A-1440-41).

The Judgment finds that "Investors Were Harmed by Findley's Conduct," citing a few emails in which existing "investors complained about the dilution of their stock holdings caused by the undisclosed, massive share issuances, about the ineffectual and inconsequential stock buyback program, and about the long-promised financial audit never coming to fruition." (A-1573).  Yet the cited emails and Tas' testimony did not prove investor harm from the press releases. None of the emails from existing investors assert that they purchased Halitron stock as a result of the press releases. (*See* A-1316-39).

35

The judge (not the jury) determined that Tas "bought Halitron stock in reliance on Findley's fraudulent statements," (A-1574, citing A-837-38), when in fact Tas was simply complaining in a June 28, 2017 LinkedIn message to Findley about the delay of the audit, and there was no evidence that he had bought or sold in reliance on alleged misstatements about the audit: "*Geeze! You dilute the PPS to almost zero and still nothing to show for it*." (A-1333).

Although Tas testified that press releases and audited financials are important to him as an existing investor, he did *not* testify that he bought or sold because of the press releases regarding the status of the audit or the stock buyback program. (A-1574, citing A-849). Instead, he testified that the press releases were important because "I was invested." (A-835-36). Even the judge's finding that Tas purchased most of his shares after a phone call with Findley "*about Halitron's prospects*" illustrates that Tas did not purchase based on allegedly misleading press releases regarding the status of the audit or the stock buyback program, (A-1574), and the testimony cited by the Judgment - that Tas claimed that Findley in a phone call "eluded to me to take advantage of the low stock price" – further proves this point. (A-851).

The Judgment relies on the post-*Govil* and post-Judgment Hearing Lopez Declaration as "further quantifying the degree of investor harm," citing that "at least 2,967 investors purchased Halitron shares" from May 12, 2017 to April 25, 2018"

who "suffered losses of at least $1,688,548," without examining whether *any* of those investor losses could be connected to the allegedly misleading press releases, and without acknowledging that the three investors described in the Lopez Declaration either traded during a period when no publicly available information had changed (one holding for one day, another holding for eleven days) or still held most shares at the end of the relevant period. (A-1575).

The Judgment admits that at the October 11, 2023 Judgment Hearing "the SEC's position was that a distribution of disgorged funds to harmed investors was not feasible," (A-1580), but then states:

> However, following that hearing, the SEC notified the Court that it had reconsidered and determined that it is feasible to distribute disgorged funds to Halitron investors who suffered trading losses during the period of the defendants' misconduct. *See* Notice Regarding Distribution Feasibility, Doc. No. 162. Therefore, the defendants' argument is moot, and I need not decide the open question whether, after Liu, disgorgement may be awarded when the funds will be deposited in the Treasury.

(*Id.*).

The Judgment then mixes apples and oranges, tying the *legal* debt financings causing dilution to the alleged misstatements in press releases, despite no evidence of any connection in the record (and contrary to Donaldson's testimony to the opposite), to conclude:

> It is clear that disgorgement is appropriate. The defendants' misconduct was designed to, and did, attract

37

> debt financing to the company, and ordering the defendants to disgorge those ill-gotten gains serves the equitable purpose of avoiding unjust enrichment.

(A-1580-81).

The Judgment cites to Findley's testimony that "[e]very public company needs investors buying stock," and that "[y]ou need an active stock market to receive debt financing as a public company" (A-422-23) to make what the judge deemed "*a perfectly reasonable inference that the debt financing funds received by the defendants during the relevant time period were causally connected to those fraudulent statements*," even though the only financier to testify made clear that his financings were *not* related to the press statements, and the SEC had provided no evidence that the debt financings were tied to the press release. (A-1440-41; A-1582). Although the Judgment deducts Donaldson's $75,000 from the disgorgement amount, it ignores that the SEC *failed* to prove that *any* debt financings were related to the alleged misstatements in press releases. (A-1582-83).

The Judgment orders disgorgement "on a joint and several basis against both defendants Findley and Halitron," finding (based on dropped allegations and not based on any jury findings) that Findley as the sole officer and director of Halitron "directly profited from the misconduct." (A-1584). This despite the Supreme Court's cautioning in *Liu* that generally courts do *not* award profits-based remedies "under a joint-and-several liability theory." *Liu*, 591 U.S. at 82-83.

The Judgment orders Findley to pay *third-tier civil penalties* of $250,000, despite no evidence of intentional misconduct or of future violations. (A-1586). The Judgment finds, against all evidence and not based on the jury findings, that "the SEC has established that there is a substantial likelihood that the defendants will violate federal securities laws in the future." (*Id.*). This despite the fact that the press releases were vetted by Appellants' attorneys and that some of the information supposedly omitted had been disclosed in Appellants' OTC Markets Disclosures. The Judgment states that Appellants "were found liable for engaging in illegal conduct, the jury found that they acted with scienter with respect to the statements about the financial audit and stock buyback programs, and the conduct was not an 'isolated occurrence,' but consisted of multiple false statements over the course of about a year that were designed to generate income for the defendants and that harmed investors. (A-1587). The foregoing was not supported by the evidence, as illustrated by the Judgment's citing to Trial Ex. 597 as evidence that Findley "ignored the advice of counsel when issuing the stock buyback press releases," because Trial Ex. 597 is simply an email from counsel suggesting that Findley not release the press release but "if [Findley is] going to release, please see my suggested changes in the attached." (A-1260). Indeed, Findley *followed* counsel's advice and responded "[m]y computer is not working. Can accept changes and send back to me?" (*Id.*).

39

Despite the Judgment's acknowledging "the stigma that an injunction places on the defendants in the industry," it concludes without any basis that "a permanent injunction against future violations of Section 10(b) of the Exchange Act and Section 17(a) of the Securities Act is warranted" to protect "potential future investors." (A-1587-88). That permanent injunction is a stain on Appellants' reputations that devastates their ability to work in the industry, and entirely unnecessary given that they are already required to abide by the law, just like everyone else.

The Judgment cites no evidence, and finds *against* the evidence, including Halitron's acquisition of the revenue-producing Hopp Companies, and goes far *outside* of the jury's findings, to find the "company was engaging in little to no actual business activity" while it issued "additional shares that diluted its stock value," thus finding that "[t]wo third-tier penalties are appropriate here, given the significant risk that the Defendant's false statements, both about the financial audit and about the stock buyback program, would result in substantial losses to investors." (A-1585).

The Judgment recognizes that a permanent injunction can only be awarded if the SEC demonstrated "'substantial likelihood of future violation' of the securities laws," (A-1577, citing *SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998)), then makes that finding without *any* evidentiary support.

As a final injustice, the Judgment orders a four-year industry bar "preventing Findley from serving as an officer and director of any public company and from

40

offering penny stocks for a period of four years," citing his "unfitness to serve as an officer or director of a public matter" despite evidence that the press releases were vetted by securities counsel and that, if anything, Findley went above and beyond to share as much information as possible with Halitron's investors. (*Compare* A-1588 *with* A-97; A-331-32; A-337; A-412; A-468-69; A-483; A-519-20; A-973; A-1073).

## <u>ARGUMENT</u>

The Judgment is erroneous as a matter of law, ignores *Govil* and *Liu*, is an abuse of discretion, and violates Findley's Seventh Amendment right to a jury determining such consequential civil penalties as a permanent injunction and four-year ban from his industry.

This case should never have reached the jury, and Appellants' Motion to Dismiss and Motions for Judgment as a Matter of Law should have been granted. No reasonable jury could have found for the SEC because there was insufficient evidence of securities fraud, and the Judgment reached far beyond the jury's findings to make factual findings unsupported by the evidence, ignoring *Govil* and accepting the SEC's sudden reversal of its admission that investors were "impossible to find" to order disgorgement and impose third-tier civil penalties unsupported by the evidence and in violation of Findley's Seventh Amendment right. Appellants respectfully request that the Judgment be reversed.

41

### I. The FRCP 50 MotionS should have been granted, and No Reasonable Jury Could have found for the SEC

Appellants' FRCP 50 motions for judgment as a matter of law should have been granted. (A-1049; A-1199). "Under *Rule 50*, a court should render judgment as a matter of law when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 149 (2000), quoting FRCP 50(a). In "entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record." *Id*. The "court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses.'" *Id*, quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 300 (1986).

Appellants made a Motion for Judgment as a Matter of Law on January 12, 2023, which the District Court took "under advisement." (A-1049-50). Appellants made a renewed Motion for Judgment on January 13, 2023, which the District Court again took "under advisement," until after the jury verdict denying the Motion "without prejudice" on March 16, 2023. (A-1199-200; A-1377).

This Court reviews a denial of Motion for Judgment as a Matter of Law *de novo*. *Runner v. N.Y. Stock Exch., Inc.*, 568 F.3d 383, 386 (2d Cir. 2009).  In so doing, this Court "should review all of the evidence in the record," *id*., giving

credence not only to the evidence favoring the SEC, but to the evidence supporting Appellants "that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses.'" *Reeves*, 530 U.S. at 151.

Harmon and Brunson were disinterested witnesses who provided unimpeached and uncontradicted testimony that at the time of the press releases the audit was "98% complete," and that Appellants were being told by the auditor that it was near completion. (A-976-77; A-1072). Harmon and Brunson, who were familiar with the audit, also testified that they reviewed the press releases before they were finalized. (A-741-43; A-1073). Donaldson was a disinterested witness who testified that he did not loan money to Halitron because of any press releases. (A-1440-41). No other financier testified.

For the same reasons that the Motion for Judgment as a Matter of Law should have been granted, the jury verdict should be overturned because no reasonable jury would have had a legally sufficient evidentiary basis to find for the SEC. The SEC presented no evidence of materiality or scienter, basing its case on forward-looking opinions and/or corporate optimism. The jury was likely confused, and Appellants prejudiced, by the SEC's dropping its scheme liability allegations at the end of trial without instructing the jury about that important fact.

### a. The SEC Failed to Prove Material Misstatements or Omissions

The SEC failed to prove material misstatements or omissions, and no reasonable jury could have found materiality or falsity based on the evidence presented. First, the statements were not false or misleading, especially when read in the context of the press releases and safe harbor language, and the evidence did not support a finding that the statements were false or misleading. Second, the statements were not objectively material because the SEC presented no evidence that a reasonable investor would have relied on the statements to trade, or that the statements would have significantly altered the "total mix" of information available to investors. *Singh v. Cigna Corp.*, 918 F.3d 57, 64 (2d Cir. 2019) (affirming dismissal where "the challenged statements [were] tentative and generic" and Plaintiffs "failed to plausibly allege that a reasonable investor would view these statements 'as having significantly altered the total mix of information made available.'").

Over Appellants' objection, only one investor – Tas – testified at trial to prove materiality, yet he proved the *opposite* of materiality. Tas testified that he purchased the majority of his shares *after* he was aware of the audit delay and stock dilution, facts which he discussed with other investors on iHub. (A-867-70). That Tas

"ultimately" lost most of his investment in the penny stock, as the District Court found, does not prove materiality of the alleged misstatements.

As a matter of law, the investors identified by the SEC nearly one year after the jury verdict could not have been submitted to prove materiality, an element that the *jury* and not the District Court was required to find. Yet even those investors described to the District Court after the Judgment Hearing where the SEC protested that investors were "virtually impossible" to find, and two weeks after *Govil*, could not as a matter of law demonstrate materiality of the statements/omissions in the press releases, because of when those investors traded. (A-1555-60).

The SEC only presented evidence that trading *volume* (not price) increased after the press releases, yet those press releases contained a wealth of information about Halitron *beyond* the status of the audit and the stock buyback program. (A-1567; A-1233-1241; A-1247-50; A-1254-59). Moreover, additional details were provided by Appellants in OTC Disclosures. (A-97; A-331-32; A-337; A-412; A-468-69; A-483; A-519-20).

Tas had already invested and made money before the press releases at issue, and testified that he purchased again because the price of the shares was so low – at

45

the time, he was already well aware of the stock dilution and delayed audit. (A-864-65; A-869).

As the Supreme Court noted in *Dura,* changes in share value are not always attributable to fraudulent misstatements or omissions because "a purchaser might sell the shares 'quickly before the relevant truth begins to leak out,' such that 'the misrepresentation will not have led to any loss.'" *Acticon AG v. China North East Petroleum Holdings, Ltd.*, 692 F.3d 34, 40 (2d Cir. 2012), quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). This is clearly the case with the three investors belatedly "identified" months after trial had ended and after the *Govil* decision: one investor sold the day after he purchased and another after just eleven days, during which time publicly available information remained unchanged. (A-1555-60).

The SEC's "proof" fails as a matter of law:

> lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price….

*Dura*, 544 U.S. at 343.

For a fact-finder to find materiality, or that investors were harmed by fraudulent misstatements or omissions, there must be at least evidence that the "truth" had begun to leak out into the market and that the shares traded at lower

46

prices as a consequence. *In re Vivendi Universal, S.A.. Securities Litigation*, 634 F. Supp.2d 352, 362 (S.D.N.Y. 2009) (discussing *Dura*). There was nothing like that here, and the SEC's only investor witness *admitted* that he purchased *more* Halitron shares *after* he was aware of the dilution due to the debt financings. [620:19-621:3; 625:3-24]. The SEC failed to meet its burden, and no reasonable jury could find for the SEC on the evidence presented.

### b. The SEC Failed to Prove Scienter

The record simply does not show evidence of scienter or the intent to defraud, and no reasonable jury could have found scienter based on the evidence presented. *See, e.g.*, *U.S. ex rel O'Donnell v. Countrywide*, 822 F.3d 650 (2d Cir. 2016) (reversing jury verdict where government failed to prove scienter).

While drawing all evidentiary inferences in favor of the SEC, without making credibility determinations or weighing the evidence, this Court determines *de novo* whether "'a reasonable jury would not have a legally sufficient evidentiary basis to find for the [non-movant].'" *Cameron v. City of N.Y.*, 598 F.3d 50, 59 (2d Cir. 2010) (alteration in original) (quoting Fed.R.Civ.P. 50(a)(1)); *Stampf v. Long Island R.R.*, 761 F.3d 192, 197–98 (2d Cir. 2014). No reasonable jury could have found for the SEC on this record, and to the extent the *judge* made factual findings those were an abuse of discretion and unsupported by the record, not to mention in violation of Appellant's Seventh Amendment right to a jury.

Uncontroverted documents and testimony prove that the press releases were reviewed by legal counsel and a financial consultant, without any red flags raised. (A-973; A-1073). Uncontroverted documents and testimony prove that Friedman was paid $100,000 for the audit and that the audit was nearly complete at the time of the press releases, albeit requiring additional work due to the acquisition of the Hopp Companies. (A-491-92). Uncontroverted documents and testimony prove that the announced stock buyback program had been approved and was occurring, as announced. None of the evidence shows scienter.

## II.   ORDERING DISGORGEMENT AFTER THE SEC ADMITTED IT WAS "VIRTUALLY IMPOSSIBLE" TO FIND INVESTORS WAS REVERSIBLE ERROR, AS WAS BASING DISGORGEMENT ON LOANS FROM UNHARMED FINANCIERS

It was reversible error to order disgorgement: (i) after the SEC submitted no evidence at trial or the Judgment Hearing of any investor harm attributable to alleged misstatements, (ii) after the SEC admitted at the Judgment Hearing it was "virtually impossible" to find investors, (iii) based on the SEC's post-*Govil* submission that *reversed* its admission that it could not identify investors to describe investors who could not, as a matter of law, have been harmed by the press releases, and (iv) basing disgorgement on loans from unharmed financiers.

Months after trial, the SEC protested at the Judgment Hearing that it had tried and failed to locate investors, yet two weeks after *Govil* the SEC suddenly reversed its position to claim it was "feasible," describing investors who had bought and sold

in such a short period of time that publicly available information had not changed. (*Compare* A-1494-95 *with* A-1562). The District Court failed to follow the precedent of *Liu* and *Govil* and abused its discretion by accepting such tardy and insufficient evidence and ordering disgorgement based on amounts loaned by *financiers* who *suffered no pecuniary harm*, with only one financier testifying (a defense witness) that he had *not relied* on press releases and was *not* interested in disgorgement. (A-1440-41).

The District Court's order of disgorgement based on amounts loaned by unharmed financiers, in reliance on the SEC's post-hearing reversal of position that was a transparent attempt to avoid *Liu* and *Govil*, was a clear abuse of discretion. As the Supreme Court stated in *Liu*, the "equitable nature of the profits remedy generally requires the SEC to return a defendant's gains to wronged investors for their benefit." 591 U.S. 71, 88. This Court affirmed in *Govil* that disgorgement may only be ordered if "investors suffered pecuniary harm *as a result of the fraud*." 86 F.4th at 94 (emphasis added).

Putting aside the SEC's post-*Govil* reversal of its admission that it was "virtually impossible" to find harmed investors, simply identifying *all investors* who bought and sold during a specified period, when publicly available information had not changed at the time of their trades, is insufficient evidence that they "suffered pecuniary harm as a result of the fraud," and requires that the Judgment be reversed

49

or vacated. *SEC v. Govil*, 86 F.4th at 94 (vacating judgment where district court did not determine whether investors suffered pecuniary harm as a result of the fraud). This is especially the case where investor "loss" is likely most attributable to share dilution, which dilution was legal and known to investors and not the subject of SEC allegations.

The District Court revealed its bias against *Liu* at the Judgment Hearing: "*It seems the law has developed in a strange way, frankly, to add on a requirement that it has to be for the benefit of investors. That's a judge-made rule that I'm not sure makes a lot of sense*…." (A-1509-10).

Because the District Court recognized that "it would be difficult or infeasible to have the disgorged profits go to" investors, it illogically determined that disgorgement could be based on monies received from unharmed financiers:

> THE COURT: *The burden, though, I think on the SEC is not especially heavy because we have – the evidence at trial certainly is that there are many, many investors and purchasers of the stock and if those are the folks who are the missing plaintiffs, that seems to be pretty infeasible, but the reason I'm getting at the folks who loaned money to Halitron is it seems to me that is a more manageable group…and why it would be difficult or infeasible to have the disgorged profits go to them.*

(A-1512) (emphasis added).

As a matter of law, and under *Govil* and *Liu*, the district court's decision to order disgorgement based on amounts loaned to a penny stock company by

unharmed debt financiers, because it was "easier" because no evidence of pecuniary harm to investors had been offered, cannot stand. The District Court also abused its discretion by accepting the SEC's post-*Govil* reversal of position, asserting that it was all of a sudden "feasible" to locate harmed investors yet describing just three investors who could not as a matter of law have relied upon or been harmed by the press releases at issue. (A-1557-60).

Months after this Court affirmed in *Govil* that under *Liu* disgorgement could not be ordered without specific findings of pecuniary harm to investors, and *after* the SEC represented at the Judgment Hearing that it did not plan to award disgorged funds to "victims," the District Court ignored *Govil* and *Liu* to order disgorgement based on the SEC's reversed position that all of a sudden it *was* feasible to distribute "disgorged funds to Halitron investors who suffered trading losses during the period of the defendants' misconduct," basing disgorgement on funds received by unharmed financiers. (A-1580). The district court erred by declaring the argument moot: "whether, after *Liu*, disgorgement may be awarded when the funds will be deposited in the Treasury," *and* erred by accepting the SEC's insufficient proof of investor harm submitted months after trial had ended. *Id.*

### III. THE RECORD DOES NOT SUPPORT THE CAREER-ENDING PERMANENT INJUNCTION, FOUR-YEAR BAN, OR THIRD-TIER CIVIL PENALTIES

Even assuming that the finding of securities violations was correct (it was not), the district court abused its discretion by branding Appellants with a permanent "scarlet letter" that all but ensures financial ruin, in the form of a permanent injunction, and by imposing on Findley a four-year ban from the industry and uncalled-for third-tier civil penalties. Such career-ending harsh penalties are exactly why the Supreme Court held in *Jarkesy* that they must be decided by a jury. *Jarkesy*, 2024 U.S. LEXIS at *36, 43-44. Here, they were not, and the penalties are completely unsupported by the record.

There is no evidence in the record supporting any reasonable likelihood of future securities violations by Appellants, and thus the permanent and four-year injunctions are completely unwarranted. *SEC v. Shapiro*, 494 F.2d 1301 (2d Cir. 1974).

The "collateral consequences of an injunction can be very grave." *SEC v. Commonwealth Chemical Securities, Inc.*, 574 F.2d 90, 99 (2d Cir. 1978). Here, even though the permanent injunction is to "abide by the law," its meaning is clear and what investor will invest with Appellants in the face of such permanent admonishment? What company will hire Findley in the face of such penalty? Why

must Appellants be subjected to such a life sentence without the ability to pay for their supposed wrongdoings and move on?

Likewise with the four-year ban preventing Findley from acting as an officer or director or trading in penny stock. "Although it is not essential for a lifetime ban that there be past violations, we think that it is essential, in the absence of such violations, that a district court articulate the factual basis for a finding of the likelihood of recurrence." *SEC v. Patel,* 61 F.3d 137 (2d Cir. 1995). Even a four-year ban, as imposed here, is inappropriate for a "first-time offender" who consulted with securities counsel in connection with the content of press releases.

The record makes clear that Findley went above and beyond to keep existing investors informed about various issues, including the status of the audit and the buyback program, and hired securities counsel and a financial consultant to ensure that his communications were not misleading. (A-97; A-331-32; A-337; A-412; A-468-69; A-483; A-519-20). Tellingly, securities counsel who was familiar with the status of the audit and announcement of the stock buyback program found no misleading statements in the press releases, and no red flags. (A-1073). Tellingly, the financial consultant familiar with the status of the audit and announcement of the stock buyback program found no misleading statements in the press releases and no red flags. (A-973). There *was* an audit, as announced to investors, which was nearly complete. (A-975-76). The auditor *was* paid $100,000. (A-491-92). The stock

53

buyback program *had* been approved and the long-term buyback of stock *had* commenced. (A-325-28).

Imposition of penalties is reviewed for abuse of discretion, and the record here makes clear that the lower court abused its discretion. The imposition of a permanent injunction, four-year injunction, and civil penalties should be reversed.

## IV. THE DISTRICT COURT ABUSED ITS DISCRETION TO ALLOW EVIDENCE OF SCHEME LIABILITY BEFORE THOSE ALLEGATIONS WERE DROPPED AT THE END OF TRIAL, WITHOUT PROPERLY INSTRUCTING THE JURY

The district court's allowing opening statements and trial evidence regarding "scheme liability" allegations, while acknowledging that the allegations were potentially confusing to the jury, and then allowing the allegations to be dropped at the end of trial without proper instructions to the jury, was an abuse of discretion that unfairly prejudiced Appellants. The prejudice to Appellants was worsened by the District Court's allowing Tas to testify over Appellants' objections because the SEC maintained that Tas' testimony was not only relevant to materiality, but to the "something extra" required for the scheme liability allegations that were dropped. (A-248-49).

The SEC's main theme in its opening statement to the jury was Appellants' alleged "scheme" to draw investors to Halitron and inflate Halitron's share price. (A-271-72; A-278; A-285). This unduly prejudiced the jury in light of the SEC's agreement at the *end* of trial to drop its scheme liability allegations, after the damage

54

was done, without proper instructions to the jury. It is simply unfair to smear someone with an allegation of a "scheme" without ever explaining that such a claim is not being proven, and it clearly tainted the jury's deliberations.

Over Appellants' objection, the SEC introduced Tas' testimony in an effort to prove not just materiality, but the "something more" required to prove scheme liability. (A-242). Tas' testimony was not probative of either, especially in light of the SEC's dropping its scheme liability allegations at the *end* of trial, and the jury should have been instructed to disregard his testimony or to disregard any references to a "scheme," but they were not. The Court should have told the jury that in evaluating the remaining claims, the SEC's pronouncement of a "scheme" should not be considered at all. The prejudice to Appellants is evidenced not just by the unreasonable Jury Verdict unsupported by the evidence, but also by the Judgment's reliance on Tas' testimony. (A-1574).

"Challenged jury instructions are reviewed *de novo*, but this Court will reverse only if all of the instructions, taken as a whole, caused the defendant prejudice." *See United States v. Bok*, 156 F.3d 157, 160 (2d Cir. 1998). "Jury instructions are erroneous if they mislead the jury or do not adequately inform the jury of the law." *Mirlis v. Greer*, 952 F.3d 36, 44 (2d Cir. 2020) (citation and internal quotation marks omitted). The "trial court has discretion in the style and wording of jury instructions so long as the instructions, taken as a whole, do not mislead the

jury as to the proper legal standard, or adequately inform the jury of the law." *Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 106–07 (2d Cir. 2001). "For a verdict to be set aside based on an erroneous jury charge, the appellant must show that the error was prejudicial in light of the charge as a whole." *Mirlis*, 952 F.3d at 44 (citation and internal quotation marks omitted).

Here, the district court's instructions to the jury were clearly prejudicial. The jury was not instructed about the SEC's last-minute dropping of its "scheme liability" allegations, and was also not properly instructed about safe harbor language. The jury was not asked to make individual findings of materiality, or to evaluate each of the statements in each of the press releases. (A-1374-76). The jury was clearly confused and Appellants were unduly prejudiced, and the jury verdict must be reversed.

## V. THE DISTRICT COURT'S FINDING OF FACTS NOT FOUND BY THE JURY AND/OR ORDERING PENALTIES VIOLATED APPELLANTS' SEVENTH AMENDMENT RIGHT TO A JURY TRIAL UNDER *SEC V. JARKESY*

The District Court's finding additional facts that should have been found by the jury, and ordering of civil penalties for securities violations, violated Appellants' Seventh Amendment right to a jury under the Supreme Court's recent *Jarkesy* decision.

"The controlling interpretation of federal law…must be given full retroactive effect in all cases still open on direct review." *Govil*, 86 F.4th 89, n.1 (2023), quoting

*Harper v. Va. Dep't of Tax'n*, 509 U.S. 86, 97 (1993). This case is still open and on direct review, and applying *Jarkesy* is required. Under *Jarkesy*, the imposition of civil penalties belonged to the jury and not to the judge, and Findley's Seventh Amendment right was violated.

Although Appellants had a jury trial, they did not have a jury determine what *Jarkesy* holds they had a right to the jury determining: *each* of the elements of the alleged securities law violations *and* the imposition of civil penalties.

In *Jarkesy*, the Supreme Court recognized that "[c]ivil penalties rank among the SEC's most potent enforcement tools" to hold that the "Seventh Amendment entitles a defendant to a jury trial when the SEC seeks civil penalties against him for securities fraud." "The right to a trial by jury is 'of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right' has always been and 'should be scrutinized with the utmost care." *Id*., quoting *Dimick v. Schidt*, 293 U.S. 474, 486 (1935). Given that such an important Constitutional right attaches to a jury determining civil penalties, the Judge's usurping that right in this case cannot stand. At a minimum, Findley's Seventh Amendment rights were violated by the judge (not the jury) determining the civil penalties, if not also violated by the judge's making factual findings that had not been made by the jury. *Jarkesy* makes that point very clear.

Because the Judgment and civil penalties violate Findley's Seventh Amendment rights under the Supreme Court's *Jarkesy* ruling, they must be reversed.

## <u>CONCLUSION</u>

For all of the foregoing reasons, this Court should reverse the Judgment.

Alternatively, the Judgment should be vacated and remanded for a new trial.

Respectfully submitted,

**BERNARD FINDLEY and HALITRON, INC., Defendants– Appellants,**

By: <u>/s/ Joseph M. Pastore III</u>
Joseph M. Pastore III
Leanne M. Shofi
PASTORE LLC
4 High Ridge Park, Third Floor
Stamford, CT 06905
203-658-8454 (tel)
203-348-0852 (fax)

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the type-volume limitation of the Federal Rule of Appellate Procedure 32(a)(7)(B) and contains 13,967 words, exclusive of the corporate disclosure statement, the table of contents, and the table of authorities, as counted by the Microsoft Word word-processing program used to generate this brief. I also certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word wordprocessing program with a 14-point Times New Roman font.

Dated: August 2, 2024

**PASTORE LLC**
**Counsel for Defendants-Appellants**
**Bernard Findley and Halitron, Inc.**

By: /s/ Joseph M. Pastore III
Joseph M. Pastore III
Leanne M. Shofi
PASTORE LLC
4 High Ridge Park, Third Floor
Stamford, CT 06905
203-658-8454 (tel)
203-348-0852 (fax)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that August 2, 2024, I electronically filed the foregoing document and accompanying Joint Appendix with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: August 2, 2024

**PASTORE LLC**
**Counsel for Defendants-Appellants**
**Bernard Findley and Halitron, Inc.**

By: <u>/s/ Joseph M. Pastore III</u>
Joseph M. Pastore III
PASTORE LLC
4 High Ridge Park, Third Floor
Stamford, CT 06905
203-658-8454 (tel)
203-348-0852 (fax)