# 24-1052

---

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

---

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee*,

v.

BERNARD FINDLEY and HALITRON, INC.,

*Defendants-Appellants*.

---

On Appeal from a Final Judgment of the United States
District Court for the District of Connecticut

---

**BRIEF OF APPELLEE
SECURITIES AND EXCHANGE COMMISSION**

---

MICHAEL A. CONLEY
Solicitor

WILLIAM K. SHIREY
Counsel to the Solicitor

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-5043 (Shirey)

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................iv

PRELIMINARY STATEMENT ............................................................1

COUNTERSTATEMENT OF JURISDICTION .....................................3

COUNTERSTATEMENT OF THE ISSUES...........................................3

COUNTERSTATEMENT OF THE CASE................................................4

A.  Facts ............................................................................................4

  1.  Findley had exclusive control over Halitron.....................................4

  2.  From 2017 to 2018, Findley diluted the value of Halitron's shares when he caused Halitron to issue billions of deeply discounted, new shares in exchange for loans. ...........................................................5

  3.  During that same period, Findley had Halitron issue press releases about the company to create an active market in its stock ...............................6

  4.  Findley was solely responsible for the content of the press releases, which he ensured were widely distributed to investors....................................7

  5.  Seven of the press releases contained false and misleading statements about the progress of the financial audit required for the uplist.................................9

    a.  Developments before the first press release in May 2017.......................10

    b.  The May and July 2017 press releases (and related developments) .......11

    c.  The December 2017 press release (and related developments)...............13

    d.  The January 2018, February 2018, and April 2018 press releases (and related developments)..................................................15

i

6. Six of the press releases contained false and misleading statements concerning Halitron's stock buyback program ...............................................16

    a. The October and November 2017 press releases, and the $800 buyback in December 2017 .......................................................................18

    b. The January 2018 press release and the $1,000 buyback that same month ..................................................................................18

    c. The February and April 2018 press releases.............................................19

    d. The June $70 buyback and the July $1,600 buyback. .............................20

7. Findley's false and misleading press releases generated an active market in Halitron stock, leading to substantial investor losses .....................................20

B. District Court Proceedings .................................................................22

  1. The complaint and jury trial .........................................................22

  2. The Remedies Order.....................................................................23

STANDARD OF REVIEW ...........................................................................24

SUMMARY OF ARGUMENT .......................................................................25

ARGUMENT ..............................................................................................27

I. Defendants have failed to demonstrate any ground for overturning the jury's verdict.. ...................................................................................................27

  A. Abundant evidence supports the jury's finding that defendants committed the antifraud violations. ......................................................................27

    1. Relevant legal standards under the antifraud provisions.........................27

    2. Defendants have failed to carry their burden to demonstrate that the jury verdict lacks sufficient evidentiary support ............................................29

      a. The Commission demonstrated at trial that the seven statements concerning the audit were materially false and made with scienter ..30

ii

      b.    The Commission demonstrated at trial that the six statements concerning the buyback program were materially false and made with scienter .................................................................................34

      c.    None of defendants' contentions undermines the jury verdict .........36

  B.  Defendants waived any contention that the district court erred by not including an instruction about the Commission's determination to drop the scheme liability claims, and, in any event, they have not shown any prejudice..........................................................................................41

II.   The district court acted within its discretion in ordering remedies for defendants' fraud. .............................................................................44

  A.  The disgorgement award should be affirmed...............................44

  B.  The civil penalties should be affirmed ........................................48

  C.  The injunctive relief should be affirmed....................................50

CONCLUSION ....................................................................................51

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

iii

## TABLE OF AUTHORITIES

**Case**                                                          **Page(s)**

*Aaron v. SEC*,
446 U.S. 680 (1980) .................. 27

*Cordance Corp. v. Amazon.com, Inc.*,
658 F.3d 1330 (Fed. Cir. 2011) .................. 30

*Folger Adam Co. v. PMI Indus., Inc.*,
938 F.2d 1529 (2d Cir. 1991) .................. 28

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000) .................. 29

*Griffin v. United States*,
502 U.S. 46 (1991) .................. 29-30

*Gronowski v. Spencer*,
424 F.3d 285 (2d Cir. 2005) .................. 24, 25

*Johnson v. N.Y. Hosp.*,
96 F.3d 33 (2d Cir. 1996) .................. 39

*Lorenzo v. SEC*,
587 U.S. 71 (2019) .................. 42

*McCarthy v. SEC*,
406 F.3d 179 (2d Cir. 2005) .................. 23

*Metro. Life Ins. Co. v. Webb*,
No. 23-897, 2024 WL 3342449 (2d Cir. July 9, 2024) .................. 25, 41

*Miss. Pub. Emps. Ret. Sys. v. Bos. Sci. Corp.*,
523 F.3d 75 (1st Cir. 2008) .................. 28-29

*Old Republic Nat'l Title Ins. Co. v. McCain*,
545 F. App'x 820 (11th Cir. 2013) .................. 44

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015) .................. 38

*Osberg v. Foot Locker, Inc.*,
862 F.3d 198 (2d Cir. 2017) .................. 25

iv

*P. Stolz Family P'ship L.P. v. Daum,*
    355 F.3d 92 (2d Cir. 2004) ................................................................ 39

*Pratt v. Petelin,*
    733 F.3d 1006 (10th Cir. 2013) ................................................ 29-30

*SEC v. Ahmed,*
    72 F.4th 379 .................................................................................... 25

*SEC v. Bankosky,*
    716 F.3d 45 (2d Cir. 2013) .......................................................... 25

*SEC v. Cavanagh,*
    155 F.3d 129 (2d Cir. 1998) ....................................................... 50

*SEC v. First Jersey Sec., Inc.,*
    101 F.3d 1450 (2d Cir. 1996) ............................................... 25, 44

*SEC v. Frohling,*
    851 F.3d 132 (2d Cir. 2016) .................................................. 27, 28

*SEC v. Govil,*
    86 F.4th 89 (2d Cir. 2023) .......................................................... 47

*SEC v. Jarkesy,*
    144 S. Ct. 2117 (2024) ................................................................. 49

*SEC v. Navellier & Assocs.,*
    108 F.4th 19 (1st Cir. 2024) ................................................... 27-28

*SEC v. North Am. Research & Development Corp.,*
    424 F.2d 63 (2d Cir. 1970) .......................................................... 29

*SEC v. Obus,*
    693 F.3d 276 (2d Cir. 2012) ....................................................... 28

*SEC v. Patel,*
    61 F.3d 137 (2d Cir. 1995) .......................................................... 50

*SEC v. Rajaratnam,*
    918 F.3d 36 (2d Cir. 2019) .......................................................... 25

*SEC v. Razmilovic,*
    738 F.3d 14 (2d Cir. 2013) .......................................................... 45

*SEC v. StratoComm Corp.*,
   652 F. App'x 35 (2d Cir. June 16, 2016) ........................................ 28

*SEC v. Texas Gulf Sulphur Co.*,
   401 F.2d 833 (2d Cir. 1968) ................................................... 27-28

*Simms v. Vill. of Albion*,
   115 F.3d 1098 (2d Cir. 1997) ...................................................... 44

*Thompson v. RelationServe Media, Inc.*,
   610 F.3d 628 (11th Cir. 2010) .................................................... 29

*Tull v. United States*,
   481 U.S. 412 (1987) ................................................................... 49

*United States v. Litvak*,
   889 F.3d 56 (2d Cir. 2018) ................................................ 27-28, 39

*United States v. Polouizzi*,
   564 F.3d 142 (2d Cir. 2009) ...................................................... 43

*United States v. Vilar*,
   729 F.3d 62 (2d Cir. 2013) ........................................................ 27

*Wilson v. Great Am. Indus.*,
   855 F.2d 987 (2d Cir. 1988) ...................................................... 28

**Statutes and Rules**

Securities Act of 1933, 15 U.S.C. §77a, et seq.
   Section 17(a), 15 U.S.C. § 77q(a) ..................................... 22, 23, 26, 27, *passim*
   Section 22(a), 15 U.S.C. § 77v(a) ......................................................... 3

Securities Exchange Act of 1934, 15 U.S.C. 78a, et seq.
   Section 3(a)(51), 15 U.S.C. § 78c(a)(51) ........................................... 5
   Section 10(b), 15 U.S.C. 78j(b) ....................................... 22, 25, 26, 27, *passim*
   Section 27(a), 15 U.S.C. § 78aa ......................................................... 3
   Section 21(d), 15 U.S.C. § 78u(d)(3)(B)(iii) .................................. 48
   Section 21(d), 15 U.S.C. § 78u(d)(7) ............................................. 45, 48

<u>Rule Under the Securities Exchange Act of 1934, 17 C.F.R. 240.01, et seq.</u>

    Rule 3a51-1, 17 C.F.R. § 240.3a51-1 ................................................... 5

    Rule 10b-5, 17 C.F.R. 240.10b-5 ...................................22, 26, 27, 41

28 U.S.C. § 1291 ................................................................................ 3

Fed. R. App. P. 4(a)(1)(B) ................................................................. 3

Fed. R. Civ. P. 49(a)(3) ................................................................... 48

Fed. R. Civ. P. 51 ....................................................................... 43, 49

## Other Authorities

U.S. Const. amend. VII ................................................................. 4, 48

SEC Office of Investor Education and Advocacy, HOW TO READ A 10-K
    (September 2011) (available at: https://www.sec.gov/files/reada10k.pdf)... .... 13

24-1052

_____

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee*,

v.

BERNARD FINDLEY and HALITRON, INC.,

*Defendants-Appellants*.

_____

On Appeal from a Final Judgment of the
United States District Court for the District of Connecticut

_____

BRIEF OF THE
SECURITIES AND EXCHANGE COMMISSION, APPELLEE

_____

**PRELIMINARY STATEMENT**

This is an appeal from a Securities and Exchange Commission enforcement

action against defendants Bernard Findley and Halitron, Inc.  *See* A1593-97.[1]

After a five-day trial, a jury found that defendants violated two antifraud

provisions of the federal securities laws.  *See* A1564-65.

_____

[1]     The following citation conventions are employed throughout this brief:  "Br.
__" refers to the defendants' opening brief filed; "A__" refers to the defendants'
appendix; and "SEC-A__" refers to the appendix the Commission filed with this
response brief.

From May 2017 through April 2018, Findley (who had exclusive control of Halitron) caused the company to issue a series of fraudulent press releases relating to the company's prospects. A1570. He intended those press releases to generate investor interest in Halitron's stock, and it worked. A1570. "Not only was there a marked increase in trading volume over the entire course of the fraud, there were significant spikes in trading around the time of a number of the press releases at issue." A1571. And that increased trading volume in turn made it possible for defendants to obtain hundreds of thousands of dollars in debt-conversion loans, money that Findley desperately needed if Halitron was to avoid bankruptcy. A1572. Findley had located debt financiers who were willing to make the loans in exchange for "deeply discounted Halitron shares they could sell at a profit[.]" A1572. But their willingness was contingent on an active market in which they could unload the shares; as Findley agreed at trial, if there was "no market for the stock, those lenders [were]n't going to lend[.]" A1572-73. In this way, Findley's fraudulent press releases, and their effect on the market, made those loans possible. But in the end, "ordinary investors lost money when billions of debt financiers' shares"—the issuance of which went "undisclosed" to investors—"flooded the market, diluting the value of Halitron's stock." A1574-75.

Based on the jury's findings and the district court's own supplemental findings at the remedies stage, the court issued an order ("Remedies Order")

2

directing that defendants disgorge an amount reflecting their ill-gotten gains from the loans (plus prejudgment interest). A1598. The Remedies Order also imposed certain injunctive relief, including a permanent injunction against future violations of the two antifraud provisions at issue in this case, and third-tier civil penalties (one for each of the two provisions that the defendants violated). A1589-90.

## COUNTERSTATEMENT OF JURISDICTION

The district court had subject matter jurisdiction under Section 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77v(a), and Section 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78aa(a). A22. The final judgment was entered on March 30, 2024. A18-19. Defendants timely appealed on April 19, 2024. A19; s*ee generally* FED. R. APP. P. 4(a)(1)(B) (60 days). This Court has jurisdiction under 28 U.S.C. § 1291 to consider the appeal.

## COUNTERSTATEMENT OF THE ISSUES

I. Whether the jury's verdict should be upheld where defendants have not carried their heavy burden of demonstrating either: (a) a lack of sufficient evidence, where trial testimony overwhelmingly demonstrates that Findley knowingly made false and misleading statements relating to information that investors deemed important; or (b) an error in jury instruction, where defendants never requested the instruction they say should have been given and, in any event, have shown no prejudice from the absence of that instruction.

3

II.     Whether the district court acted within its broad discretion when it: (a) ordered defendants to disgorge the amount of the loans that they were able to obtain as a result of the fraud on investors; (b) imposed civil penalties on defendants based on the statutory criteria and in accordance with well-established Seventh Amendment jurisprudence (*see* U.S. CONST. amend. VII); and (c) imposed certain injunctive relief against defendants based on the court's application of the relevant standards to the significant evidence of their violations.

## COUNTERSTATEMENT OF THE CASE

### A.     Facts

#### 1.     Findley had exclusive control over Halitron.

Findley gained exclusive control of Halitron in 2015, acquiring 100% of its preferred stock.  A295, A435.  At all relevant times, Findley was Halitron's CEO, chairman of the board of directors, and sole board member.  A299, A435.  And, other than an administrative assistant, Findley was Halitron's only employee. A299-300.  As a result, Findley had full authority for every action Halitron took, which included sole responsibility for all Halitron's business and financial decisions.  A300.

While Findley exercised exclusive control through his ownership of Halitron's preferred stock, the company's common stock was publicly traded on the OTC Pink Basic trading platform ("Pink Basic").  A295-96.  That platform

trades penny stocks, which, like Halitron's common shares, trade for as little as a fraction of a penny. *See* A296, SEC-A18; *see generally* Exchange Act § 3(a)(51); 17 CFR § 240.3a51-1 (defining "penny stock").[2]

Findley represented to investors that Halitron was "focused on acquiring sales, marketing and manufacturing businesses and then rolling them into an efficient low-cost operating infrastructure." A302. In actuality, it was a shell company located in a small office in Newtown, Connecticut, that generated almost no revenue. A300-03, A311, A436, A671. Findley borrowed large sums on Halitron's behalf to keep it from going bankrupt. A311, A314-315, A339, A420.

> ### 2. From 2017 to 2018, Findley diluted the value of Halitron's shares when he caused Halitron to issue billions of deeply discounted, new shares in exchange for loans.

In April 2017, Halitron had 448 million shares outstanding. A890, SEC-A9. By July 2018, Findley had caused Halitron's outstanding shares to increase to 12.9 billion shares—an increase of approximately 2,800%. A313, A338, A340, A347, A888, A890, SEC-A8, SEC-A9. Findley exchanged these shares at a deeply discounted price (*i.e.*, significantly below the trading price on Pink Basic) for

---

[2]  Findley testified that Pink Basic was the "easiest exchange to list on" because it had the "fewest requirements for a company" to trade. A298. For example, unlike "the New York Stock Exchange or NASDAQ," Pink Basic was a voluntary "self-reporting" trading platform that lacked specific disclosure requirements. A298.

$298,000 in loans (among other things). A312, A420, SEC-A35(¶7), Br. 35; *see also* A313, A328, A338, A518.

As the debt financiers and others sold their shares into the market, this diluted the value of the existing shares, thereby making them less valuable on a per-share basis. A343, A347. Indeed, from April 2017 to May 2018, Halitron's price per share fell 1,200%; it went from a high of $.003 per share (April 2017) to approximately $.00025 (May 2018). A891, SEC-A9, SEC-A13; *see also* A624-25.

### 3. During that same period, Findley had Halitron issue press releases about the company to create an active market in its stock.

Debt financiers were willing to loan the defendants money in exchange for discounted shares only if there were investors in the securities market who were willing to buy the shares. A423. Without that investor demand, the debt financiers could be stuck holding the shares with no way to profit from the loans. A423.

To generate investor demand for the 12 billion newly issued shares, Findley had Halitron issue numerous press releases between May 2017 and April 2018 portraying Halitron stock as a promising investment. A1570; *see also* A1565, A1570. Many of these press releases addressed Halitron's plan to "uplist" from Pink Basic to a higher tier trading platform called OTCQB Market. *See, e.g.*, A1233 (May 12: 2017: "still on path to becoming a[n] … audited OTCQB traded company by mid-year"); (October 30, 2017: listing steps "to uplist to the OTC Markets QB level" and stating "Management is hoping to complete all of these

6

requirements by the end of the first quarter of 2018"); *see also* A1242-43, A1247, A1249, A1254, A1257-58.  OTCQB was a "better" trading platform than Pink Basic because the companies that traded on it were required to comply with more requirements related to corporate governance, the company's financial condition, and financial disclosures to the investing public.  A321; *see also* A1242.  Because those requirements provided investors with greater relative transparency into, and confidence in, the companies trading on the OTCQB, more investors were attracted to companies trading there (relative to Pink Basic), thus expanding a company's potential "investor base."  A508; *see* A321; *see also* A1233 (May 12, 2017:  "We believe that this will open more doors for us, in terms of not only access to capital but also, an increasing number of future acquisitions.").

Two of the requirements for an uplist to the OTCQB Market are "[a]udited annual financials" prepared by a registered independent auditor (A323-24, A391, 1242) and the stock trading for a penny or more for the 30 days before the uplist. A321, A1242.  The press releases repeatedly explained that these two requirements were directly tied to the uplist and the financial opportunities it would unlock.  *See, e.g.*, A1233, A1242, A1247, A1249, A1254.

### 4.    Findley was solely responsible for the content of the press releases, which he ensured were widely distributed to investors.

Findley was responsible for all the content in Halitron's press releases. A320, A419.  And while he provided drafts of some press releases to a securities

attorney for review (A1073, A1081), that attorney did not "fact-check" them (A1073, A1081), represent to Findley that he had fact-checked them (A1084; *see also* A1086), render any opinion that the facts in the press releases were complete and accurate (A1084-85), or advise Findley that they were not false or misleading (A1084).[3]  The attorney's review was limited to making sure the press releases included "no undue exaggerations" or "hyperbolic" language.  A1074.

Moreover, the attorney advised Findley that:  the press releases had to be "100 percent accurate and reliable"; "even with forward-looking statement qualifiers like 'anticipates,' the company should never state that it anticipates X to occur unless it has a verifiable basis for that expectation/belief" (A1087); and "the press releases should not omit any important information" (A1085, A1087; SEC-

---

[3]    The engagement agreement with the law firm provided that "in performing its duties pursuant to this agreement, our firm will be using and rely on data, materials, documents, and other information furnished by the client and the representatives."  A1084-86; SEC-A19-20.  The agreement further provided that "[i]n order to allow for our representation to be effective, the client represents that the information will be accurate and complete in all material respects at the time provided, and that if the information becomes inaccurate, incomplete or misleading during the term of our engagement hereunder, the client will so notify us in writing."  A1086.  And to make clear that the attorney had no responsibility for fact checking any information that Findley provided, it stated: "Our firm assumes no responsibility for the accuracy or completeness of the information.  In rendering the services under this agreement, we will use and rely on the information without independent investigation, verification, or evaluation."  A1086.  Consistent with the engagement agreement, the securities attorney during his review of the press releases assumed that the factual representations in them were accurate and that the releases did not omit important information.  A1083, A1085-86.

8

A21). And while Findley also shared drafts of the press releases with an outside financial consultant (Bruce Harmon) whom Halitron had retained to help compile the company's financial records for the audit, that consultant did nothing more than edit the press releases for grammar. A1005.

To help ensure that the press releases generated investor interest in Halitron's stock, Findley hired an outside firm called Global Discovery to broadly disseminate the information publicly. A318-19, A322; *see also* A471. This firm composed stories and articles based on Halitron's press releases and then distributed them to major financial websites and wire services. A317-18; *see also* SEC-A28-33. Findley also paid the firm to distribute information to potential investors through targeted emails and telephone efforts. A317-18 ; *see also* A881-82 (defendants paid Global Discovery approximately $115,000 between July 2016 and April 2018). The goal of these efforts was to "distribut[e]" the information in the press releases "to the world." A593.

> ### 5. Seven of the press releases contained false and misleading statements about the progress of the financial audit required for the uplist.

Halitron's misrepresentations about the financial audit in the relevant press releases concerned the progress and expected completion of the audit. Each release conveyed to the investing public that the audit was well underway and

9

would soon be done, when in each instance Findley knew otherwise given the circumstances around the audit.

### a.    Developments before the first press release in May 2017

Although Halitron retained the audit firm Friedman LLC in October 2016 (A392, A669), the actual audit work was delayed for months because Halitron had not compiled the financial records required for the audit.[4] A673, A677.  Halitron had a "lot of sloppy documentation" that complicated and delayed the provision of the underlying information.  A670, A673; *see also* A667 (testimony that Halitron had to first complete the process of closing their records and then provide Friedman a package that it could audit).  And Halitron's efforts to compile the records was made more difficult by the fact that the audit extended over an eight-year period reaching back to 2008, during most of which Findley had no involvement with the company.  A393, A662, A677, A969.  Indeed, Halitron's books and records were in such bad shape that Findley retained an outside financial consultant, Bruce Harmon, to assemble the materials for Friedman's audit (and to respond to Friedman's information requests once the audit commenced).  A490,

---

[4]    An auditor's responsibility is to "give a reasonable level of assurance on the accuracy" of the company's financial statements by "verify[ing] the information and mak[ing] sure it's in compliance with certain [accounting] standards."  A658; *see also* A392.  But before an auditor can undertake this process, the company being audited must provide the underlying books and financial records for the audit.  A658, A664-65.

A665-66, A968.  All the underlying financial numbers that went into the financials came from Findley.  A1002.

### b.  The May and July 2017 press releases (and related developments)

On May 12, 2017, Halitron issued a press release announcing that it expected "the completion of its audit in May-June 2017[.]"  A396, A1233.  But at that point, Friedman had not even started the audit.  A669.  It was only on May 22, 2017, that Friedman—in an email from Justin Van Fleet, the "lead engagement partner" overseeing the audit (A659-660)—notified Findley that the audit team would "start" to review the underlying financial information that Halitron had provided and would "provide a request list for any open points."  SEC-A1.

In that same email, Van Fleet advised Findley that the auditing package was substantially incomplete for FY2016 and that any work on that year could not commence until Friedman received the missing information.  SEC-A1.  Findley responded to Van Fleet's email on the same day, stating that he had "texted Bruce [Harmon]" about the missing 2016 information and adding that they would do "[w]hatever it takes to get the audit done by the end of the month"—*i.e.*, nine days later.  SEC-A1.  Van Fleet did not respond to the email; instead, consistent with his practice when Findley emailed about completing the audit, Van Fleet called Findley directly to explain "what's still open in the audit" and to caution that Friedman "can't finish before you finish" providing all the necessary books and

11

records. A755-56. Van Fleet never said—during the follow-up call with Findley or at any other point during the audit engagement—that the audit would be "completed by May[/]June 2017" or otherwise committed to a timeline for completing the audit. A675, A678-80; *see also* A757 (Harmon was "always very aware of what had to be provided to [Friedman] to move forward and continue to work" on the audit).

On June 22, 2017, the audit team emailed to Findley and Harmon a list of open items related primarily to Halitron's extensive equity transactions (SEC-A3-7), which were important because the extensive stock transactions were "a key focus of [the audit]" (A681). The email included 22 detailed questions about Halitron's stock transactions that required "corroborat[ing] evidence, some kind of contract, some kind of agreement to substantiate those transactions." A683. And on July 7, 2017, Friedman's audit team sent Findley and Harmon an updated list of action items for Halitron to address. A1315. Findley responded on the same day with an email complaining there was "no end in sight" to the audit. A1314; *see also* A407.

Notwithstanding his knowledge of the extensive list of items that Friedman still needed addressed, and with Friedman having been unable so far to complete the audit of the financial statements for even one year (*see* A412, A1006), Findley caused Halitron to issue two separate press releases in July 2017 representing that

12

the audit would soon be done (A407-08). *See also* A689-94 (the audit was not nearing completion and Halitron was never told the process was almost complete). In a press release dated July 18, Halitron represented that "Management anticipates completing the audit shortly[.]" A1235. That was followed by a July 24 press release representing that "the auditing process [is] almost complete[.]" A1238.

### c. The December 2017 press release (and related developments)

In October 2017, Halitron provided Friedman with a draft Form 10-K[5] for the audit team's review. A697. Friedman found the draft Form 10-K "really confusing" because there were "a lot of inconsistencies with what [Friedman was] auditing[]." A698. Indeed, the draft Form 10-K took the audit "backwards a little bit because there were just so many questions and inconsistencies." A698. Friedman emailed the draft Form 10-K back to Halitron in October with "a lot of comments" so that Haliton could "start addressing those." A698.

Critically, Friedman did no more substantive work on the audit after October 2017 (A698-99), and communication with Halitron about the substance of the audit "just stopped." A701; *see also* A1007-08. And at that point, "[t]here [were] still

---

[5]     A Form 10-K is a document that public companies like Halitron are required to file with the Commission annually. A304, A663. It includes financial statements prepared by the company but audited by an independent accountant. A663; *see also* A304. For a basic overview of Form 10-K, *see* SEC Office of Investor Education and Advocacy, BULLETIN: HOW TO READ A 10-K (September 2011) (available at: https://www.sec.gov/files/reada10k.pdf).

open items and there [were] still those questions around common stock" that

Halitron had never resolved. A702. Further, by the end of Fall 2017 (if not

before), Harmon had stopped assisting Halitron with the preparation of the

materials for the audit. *See* A988-94. Before Harmon quit, however, he repeatedly

told Findley's administrative assistant that Halitron had "a long way to go" to be

able to respond to the open items Friedman had identified. A783-84; *see also*

A413-14, A1005.

     Although Friedman had stopped all work on the audit by the end of October,

Halitron signed a revised engagement agreement with Friedman in early December

to expand the audit to include the 2017 financials. A412. But Friedman never

resumed substantive work on the audit because Halitron failed to provide the

missing information and documentation regarding the open items. A700, A703-04.

Moreover, Friedman told Halitron that it would be unable to do the 2017 audit until

the audit for each of the prior years was complete. A700-01 ("When [Halitron]

came to [Friedman] to try to do the 2017 audit, we said we still have to complete

the project, all these years, because … [of] a concept called 'open balances.' So

we couldn't just move on to the next year. … So we made it very clear to Mr.

Findley and Harmon that … we still had to complete our work for the prior

years."). Thus, Findley understood the other years of the audit going back to

2008—none of which had been completed (A411-12)—would have to be finished before Friedman could do the 2017 audit.

Yet, on December 11, 2017, Findley caused Halitron to issue a press release with the subject "Up List Imminent" that discussed completion of the "audit for 2017" being "one of the requirements" for the uplist. A1247; *see also* A410. The press release went on to state that "Management expects the 2017 audit to be completed during the early part of 2018, with an uplist to the OTCQB following shortly thereafter." A1247.

### d. The January 2018, February 2018, and April 2018 press releases (and related developments)

Friedman did no substantive work on the Halitron audit in 2018. A417-18, A704-05. And with Harmon no longer involved with the audit (A418), Friedman's information and documentation requests remained unresolved (*see* A702). The project was at a standstill, without a single year of the audit having been completed, let alone the eight years that was required. A385, A418, A705, A1006.

But Findley issued three press releases between January 2018 and April 2018 that falsely represented that the audit's completion was imminent and that the uplist would occur soon thereafter. *See* A1569-1570. In a press release on January 22, 2018, Halitron announced that "[t]he audit work is underway and is expected to complete in the first half of 2018 with the objective to uplist to the OTCQB." A1249. In a press release on February 28, 2018, Halitron announced that "[a] U.S.

15

GAAP audit, another qualifying factor[] for the uplist … will commence quickly" and promised within "weeks ... a more precise timeline on completion." A1254; *see also* A416. And finally, in a press release issued on April 25, 2018, Halitron explained again that the audit "is one of the qualifying factors to uplist to the OTCQB exchange" and announced that "Friedman … will continue to finalize the project … over the coming months." A1257; *see also* A419.

**6.** **Six of the press releases contained false and misleading statements concerning Halitron's stock buyback program.**

Halitron's press releases also repeatedly explained that the company needed to increase the share price to at least a penny for thirty days as a requirement for the uplist. For example, in the October 2017 press release that first announced the stock buyback program, Halitron stated that "[t]o complete the OTCQB [uplist] application," Halitron must "[h]ave a minimum bid price of $0.01 as of the close of business for each of the last 30 calendar days." A1242. The January 22, 2018 press release stated that the "$0.01 share price is one of the requirements … to uplist to the OTCQB." A1249; *see also, e.g.*, A1254 (February 28, 2018: similar); A1258 (April 25, 2018: similar). That press release went on to explain "to increase its share price to $0.01 per share," Halitron would "buy back shares in the open market." A1249 (January 22, 2018); *see also* A336-37 (Findley: admitting that the press releases were telling investors "that the buyback is intended to get the share price up to a penny"); *see generally* A514, A517 (discussing buyback).

16

But Findley knew from the outset that Halitron's buyback program would not succeed in increasing the share price for an uplist. *First*, the company lacked the necessary revenue to fund a serious buyback effort because, as Findley knew, Halitron's only source of cash during the period in which the press releases touting the buyback were issued was loans that were being made in exchange for billions of discounted shares. A420, A554-55; *cf.* A801 (describing administrative assistant's efforts to "transfer money" among bank accounts because she did not "want all the accounts to show zero"). *Second*, as Findley knew would happen, the billions of discounted shares going into the market would further deflate the share price, which was already well below the penny price required for an uplist. *See* A346. Findley understood the potential consequences to Halitron's stock from such dilution "long before" the October 2017 press release announcing the buyback, writing in a July 2016 email that "you could destroy a company['s] value by releasing too many shares at once[.]" A346-347.

By the end of July 2018, Halitron had bought back only $3,470 worth of stock. A337-38. This was approximately 15 million shares (A337-38), or just "a little over one one-thousandth" of the 12 billion discounted shares that Halitron issued over the same period. A340-42. Unsurprisingly, Halitron's buyback program failed to raise its stock price for the uplist. A901, SEC-A13-17.

17

### a. The October and November 2017 press releases, and the $800 buyback in December 2017

In a press release issued on October 30, 2017, Halitron announced "a stock buyback of Halitron's common shares in the open market up to a price of $0.01." A1242. The press release explained that this price "must be achieved" for Halitron "[t]o complete" the uplist. A1242. Findley followed this with a Halitron press release on November 10, 2017, announcing that the company was "now realizing a positive cash flow" to fund the buyback program, when in fact the company was surviving on the debt-conversion financing, as Findley knew. A311, A1245; *see* A329.

Neither press release coincided with a stock buyback. In fact, Halitron waited until December 22, 2018 to first repurchase any shares. And that buyback—which involved only 4 million shares totaling $800 (A524)—was dwarfed by the "little over a billion" discounted shares that Halitron issued just between the November 10 press release and the December 22 buyback (A897). Critically, neither of the press releases disclosed the issuance of these discounted shares or that Halitron was engaged in stock dilution. *See* A340, A608.

### b. The January 2018 press release and the $1,000 buyback that same month

On January 22, 2018, Findley issued a press release announcing that "Halitron has begun to buy back shares in the open market" in order "to increase

18

its share price to $0.01 per share." A1249. The press release did not disclose that only $800 worth of stock had been repurchased or the number of shares, and it mentioned nothing about Halitron's ongoing stock dilution. A331-32, A609. On January 30, Halitron repurchased 2.5 million more shares for $1,000. A524. These repurchases, like the prior ones, were dwarfed by the share dilution arising from the debt financing transactions.

### c. The February and April 2018 press releases

On February 6, 2018, Halitron issued another press release about the buyback program, announcing Halitron had completed "[re]purchases of Halitron common stock in the open market," without disclosing the total cost or number of shares repurchased. A1251. Nor did it mention anything about Halitron's ongoing stock dilution. A622-23. The press release conveyed that the buyback program would continue, announcing that "Management anticipates that the Company will continue to buy back shares as cash flows from operations are available." A1251.

On February 28, Findley caused Halitron to issue another press release about the buyback program. It stated in pertinent part:

> Management has begun to and is committed to acquiring additional shares back in the open market to help support an increase in share price, of up to $0.01 per share. This is done in an effort to meet one of the qualifying factors of an up-list to the OTCQB.

A1254. At that point there had been no additional buybacks. A336.

On April 25, Halitron issued yet another press release regarding the buyback

19

program, repeating that a "requirement for the uplist is a share price of $0.01 or higher" and announcing that Halitron "is currently engaged in a share buyback program to help support [sic] increased share price." A1258; *see* A337 (the press release was "telling shareholders here that the buyback was intended to get the share price up to a penny"). Critically, the press release did not disclose the absence of any buybacks since January or the meager amounts expended for the two buybacks ($1,800 total) that had previously occurred. A337. Nor did the press release disclose anything about the ongoing dilution of Halitron's shares. A340, A426, A608.

### d. The June $70 buyback and the July $1,600 buyback

On June 29, Halitron bought back 325,000 shares for $70. A335, A524. And on July 2, Halitron undertook the final buyback, acquiring 8 million shares for $1,600. A898, A900. By this point, Halitron had issued over 12 billion discounted shares to lenders and others. A338, A340.

### 7. Findley's false and misleading press releases generated an active market in Halitron stock, leading to substantial investor losses.

The false and misleading press releases favorably disposed investors to Halitron stock and created the active market necessary to facilitate the loans. For example, Global Discovery (the outside firm that Findley retained to distribute information from the press releases) sent Findley an email entitled "New Investments" following its distribution of Halitron's July 18, 2017 and July 24,

20

2017 misleading press releases. SEC-A26-27; *see also* A319-20. Global Discovery's email advised that Halitron "stock saw about $625,000 in trading volume" and of that "about $400,000 was new money in" (SEC-A26-27; *see also* A319-20), which Findley understood to mean that "as a result" of Global Discovery's distribution of the information in the press releases, "there was $625,000 of trading" in Halitron stock. A320. Similarly, an investor named Gary Tas invested in Halitron in 2017 based "[m]ainly [on] the press releases" (A831). The information about Halitron completing the financial audit and the stock buyback program were important to him when making his investment decisions. A836-38, A840-43, A846-47.

The false and misleading press releases generated an active market in Halitron shares for the debt financiers to profit, while Halitron's retail investors were harmed. From May 2017 to April 2018, at least 2,967 investors purchased Halitron shares and suffered trading losses of at least $1,688,548. A1556(¶6). Throughout that period, Findley received myriad emails from investors complaining about the share dilution seemingly causing the collapse in Halitron's share price and their resulting investment losses. A351-52, A356; *see also* A353 (discussing email from a harmed investor who said he was "very disappointed" and who explained that he had "organized a massive buy-in, and a lot of [his] followers have dumped out now at losses or break even").

21

**B.      District Court Proceedings**

**1.      The complaint and jury trial**

In March 2020, the Commission filed this civil action against Findley and Halitron for "defraud[ing] investors by disseminating false and misleading press releases about Halitron[.]" A20(¶1). The complaint alleged that the defendants intended the false and misleading statements to "create and increase liquidity for Halitron stock[.]" A23-24(¶¶13-14). In turn, this would "facilitate [Halitron's] debt financing transactions" by "mak[ing] Halitron's stock appealing to the financiers by making it easier for them to sell the [discounted] stock into the public securities markets at higher share prices." A23(¶¶12-13). Based on this misconduct, the Commission's complaint alleged antifraud violations under Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act (and Rule 10b-5 thereunder).

In January 2023, the district court held a jury trial that included five days of testimony. *See* A13. The jury heard testimony from Findley, Gary Tas (one of the harmed investors), Van Fleet (who oversaw the audit), a Commission accountant, and others.

The jury found that defendants violated both antifraud provisions. *See* A1374-76. And in response to special interrogatories, the jury found that defendants, acting with scienter, made at least one materially false or misleading

22

statement about the financial audit and at least one false or misleading statement about the buyback program. *See* A1374-76. The jury also found that defendants violated Section 17(a)(2) of the Securities Act by negligently making a false and misleading statement about a $3 million promissory note. [6]

## 2.    The Remedies Order

On February 21, 2024, the district court issued the Remedies Order, which included the following additional factual findings in support of the equitable remedies:

- Each of the seven press releases about the audit was false and misleading, and defendants acted with scienter in making them. A1565, A1567-70.

- Each of the six press releases about the buyback program was false and misleading, and defendants acted with scienter in making them. A1565-67.

- The "fraudulent misrepresentations" over the "course of a year" were "designed to create investor demand for Halitron's stock." A1570. "Indeed, there was a marked increase in trading volume for Halitron's stock over the duration of Findley's fraud[.]" A1571; *see also id.* (finding "significant spikes in trading around the time of a number of the press releases").

- "Increased demand for Halitron stock was necessary to attract debt financiers that would provide funding to Halitron in exchange for deeply discounted Halitron shares they could sell at a profit." A1572.

---

[6]     Defendants admit that they have not challenged this jury finding on appeal. *See* Br. 6 n.2. Thus, even if this Court were to overturn the jury's verdict as to the audit and the buyback program, this finding of liability would remain. *See generally McCarthy v. SEC*, 406 F.3d 179, 186 (2d Cir. 2005) (holding that "arguments not raised in an appellant's opening brief" are relinquished).

- Investors were harmed by defendants' fraud, as demonstrated by investor complaints that Findley received regarding the stock dilution, "about the ineffectual and inconsequential stock buyback program, and about the long-promised financial audit never coming to fruition." A1573-74.  Investor harm was also demonstrated through the testimony of Tas and by a post-trial analysis done by the Commission's financial economist.  A1574-75.

Based on the jury's findings and the findings in the Remedies Order, the court imposed a permanent injunction restraining and enjoining defendants from violating the two antifraud provisions; a four-year bar on Findley acting as an officer or director of a public company; and a four-year bar on Findley participating in an offering of a penny stock.  A1586-89.  The district court also ordered defendants to disgorge $223,000 (with prejudgment interest) on a joint-and-several basis.  A1583-84.  Finally, the district court imposed "[t]wo third-tier civil penalties"—one for each antifraud provision violated—for a total civil penalty of $250,000.  A1584-86.

## STANDARD OF REVIEW

"In reviewing the sufficiency of the evidence in support of a jury's verdict, [this Court] examine[s] the evidence in the light most favorable to the party in whose favor the jury decided, drawing all reasonable inferences in the winning party's favor."  *Gronowski v. Spencer*, 424 F.3d 285, 291-92 (2d Cir. 2005).  Further, this Court will not "weigh conflicting evidence, determine the credibility of witnesses, or substitute [its] judgment for that of the jury."  *Id.* at 292.  This

24

Court "will overturn a verdict only if there is [1] such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise or conjecture, or [2] such an overwhelming amount of evidence in favor of the appellant that reasonable and fair-minded [persons] could not arrive at a verdict against appellant." *Id.* (cleaned up). This Court will not review (even for plain error) a waived argument challenging a jury instruction. *See Metropolitan Life Insurance Company v. Webb*, 2024 WL 3342449, at *1 (2d Cir. July 9, 2024).

Further, this Court will review a disgorgement order, civil penalties, professional bars, and a permanent injunction for abuse of discretion. *See, e.g.*, *SEC v. Ahmed*, 72 F.4th 379, 395 (2d Cir. 2023) (disgorgement); *SEC v. Rajaratnam*, 918 F.3d 36, 41 (2d Cir. 2019) (civil penalty); *SEC v. Bankasky*, 716 F.3d 45, 47 (2d Cir. 2013) (professional bar); *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1477-78 (2d Cir. 1986) (permanent injunction). Finally, "[w]here the award of equitable relief is supported by findings of fact, such findings are reviewed for clear error." *Osberg v. Foot Locker, Inc.*, 862 F.3d 198, 206 (2d Cir. 2017).

## SUMMARY OF ARGUMENT

I. The Commission presented evidence at trial demonstrating that defendants, acting with scienter, made materially false and misleading statements

25

about Halitron's financial audit and buyback program. This evidence supports the jury's verdict that defendants violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act (and Rule 10b-5 thereunder). And while defendants contend that the district court should have included an instruction relating to certain claims the Commission dropped near the end of the trial, defendants waived this argument by knowingly and voluntarily declining to request such an instruction.

II. The district court acted well within its discretion in ordering defendants to disgorge the proceeds of the loans that they received because those loans were the motivation for, and were made possible by, the fraud. The district court also reasonably determined that the disgorged funds could be distributed to Halitron investors who were harmed by the defendants' fraud. And the district court's imposition of civil penalties based on the record evidence demonstrating defendants' violations was consistent with well-established Seventh Amendment precedent. Finally, the district court assessed the relevant factors for a permanent injunction and employment bars, and based on that same record evidence, determined within its sound discretion that the injunctive relief was warranted.

# ARGUMENT

I.   **Defendants have failed to demonstrate any ground for overturning the jury's verdict.**

   A.   **Abundant evidence supports the jury's finding that defendants committed the antifraud violations.**

   1.   **Relevant legal standards under the antifraud provisions**

Section 10(b) of the Exchange Act (and Rule 10b-5(b) thereunder) are violated when a person, in connection with the purchase and sale of a security, (1) makes a materially false or misleading representation (2) with scienter.  *See SEC v. Frohling*, 851 F.3d 132, 136 (2d Cir. 2016).  Further, conduct that violates Section 10(b) (and Rule 10b-5(b)) will also establish a violation of Section 17(a)(2) of the Securities Act.[7]  *See also Frohling*, 851 F.3d at 136 (observing that the elements of a Section 17(a) violation are "essentially the same" as the elements of a claim under Section 10(b)).

A false or misleading statement is material if there is "a substantial likelihood that a reasonable investor would find the … misrepresentation important in making an investment decision."  *United States v. Vilar*, 729 F.3d 62, 69 (2d Cir. 2013) (internal quotation marks and citations omitted).  "A finding of materiality does not require proof of actual reliance."  *United States v. Litvak*, 889 F.3d 56, 65

---

[7]   Although not relevant to this appeal, liability under Section 17(a)(2) or 17(a)(3) may also be established by a showing of negligence.  *Aaron v. Securities and Exchange Commission*, 446 U.S. 680, 697 (1980).

(2d Cir. 2018) (internal quotation marks and citations omitted); *see Navellier & Assocs, Inc.*, 108 F.4th 19, 37 (1st Cir. 2024) (similar).  Material misrepresentations include statements that "affect the probable future of the company and those which may affect the desire of investors to buy, sell or hold the company's securities." *Wilson v. Great Am. Industries, Inc.*, 855 F.2d 987, 992 (2d Cir. 1988) (cleaned up) (quoting *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968) (*en banc*)).  And a material misrepresentation need not be "outcome determinative"—*i.e.*, it need not be important enough that it would cause a reasonable investor to make a different decision.  *Folger Adam Co. v. PMI Industries, Inc.*, 938 F.2d 1529, 1534 (2d Cir. 1991).

Further, a false or misleading statement was made with the requisite scienter if it was made with the "intent to deceive, manipulate, or defraud." *SEC v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012) (internal quotation marks and citation omitted). Scienter can be established by demonstrating that, when the statement was made, the defendant knew it to be false or acted with "reckless disregard" for its truth, meaning "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *Frohling*, 851 F.3d at 136; *see also SEC v. Stratocomm Corp. et al.*, 652 Fed. Appx. 35, 38 (2d Cir. June 16, 2016) (holding that scienter standard satisfied because the defendants "knew the statements at issue to be false when made"); *see generally Mississippi Public*

28

*Employees' Retirement System v. Boston Scientific Corp.*, 523 F.3d 75, 91 (1st Cir. 2008) (explaining that a short time period between conduct revealing a contrary view to that expressed in a false or misleading statement is "strong evidence" of scienter).  Facts demonstrating both a motive and an opportunity to make the materially false or misleading statement can support a scienter showing.  *See Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 168-69 (2d Cir. 2000).  Finally, Findley's scienter is imputed to Halitron given his exclusive control of the company.  *See, e.g.*, *SEC v. North Am. Research & Development Corp.*, 424 F.2d 63, 79 (2d Cir. 1970); *see also Thompson v. RelationServe Media, Inc.*, 610 F.3d 682, 635 (11th Cir. 2010).

## 2. Defendants have failed to carry their burden to demonstrate that the jury verdict lacks sufficient evidentiary support.

For the jury to find violations of the antifraud provisions at issue, it was enough under the jury instructions—to which both parties agreed (A1055)—for the Commission to establish that the defendants made a single false or materially misleading statement with scienter.  *See* A1374-76; *see also* A1584 (jury's verdict form establishes two statutory violations).  As a result, the defendants can unsettle the jury's verdict only if they carry the heavy burden of demonstrating that the Commission's evidence was insufficient as to every one of the thirteen statements at issue (seven concerning the audit, six concerning the buyback program).  *See*

29

*Griffin v. United States*, 502 U.S. 46, 58 (1991) (explaining that an appellate court should affirm a jury verdict that suffers from "insufficiency of proof" as to some but not all of the alternative factual bases); *see, e.g.*, *Pratt v. Petelin*, 733 F.3d 1006, 1009-13 (10th Cir. 2013); *Cordance Corp. v. Amazon.Com Inc.*, 658 F.3d 1330, 1339 (Fed. Cir. 2011). Defendants fall far short of that required showing.

**a.** **The Commission demonstrated at trial that the seven statements concerning the audit were materially false and made with scienter.**

As the district court detailed in the Remedies Order (while citing exclusively to trial testimony and exhibits), "each of the seven press releases concerning the audit was false or misleading." A1567 (cleaned up).

- The May 27, 2017 press release represented that the audit would be completed in "May-June 2017," but that was false or misleading because: Friedman had not yet started substantive work on the audit; the project was substantial, requiring the preparation of audited financials going back to 2008; and the lead partner overseeing the audit never (then or at any point during the relevant period) gave any assurances about the timing for completing the audit. A1567-68.

- The July 18, 2017 press release represented that "Management anticipates completing the audit shortly" and the July 24, 2017 press release represented that the audit was "almost complete," but both statements were false or

30

misleading because: on June 22, 2017, the auditor had provided a lengthy list of open items that the defendants had yet to respond to (and in fact never fully responded to over the course of the fraud); on June 24, 2017, Findley sent an email stating he was "very concerned about the timing of the [audit] project"; and on July 7, 2017, Findley sent an email stating there was "no end in sight" to the audit. A1568.

- The <u>December 11, 2017 press release</u> represented that "Management expects the 2017 audit to be completed during the early part of 2018[,]" but this was false or misleading because: the auditor had stopped working on the audit in October, not having completed the audit for a single year (and, as Findley knew, all of the earlier years would need to be completed before an audit of Halitron's 2017 financials could occur); the open items from the summer regarding Halitron's equity transactions had never been fully addressed; and Harmon—the financial consultant who had been the point person to address the auditor's inquiries—had stopped working for Halitron at least a month earlier. A1569; *see also* A411, A700-702.

- The <u>January 22, 2018 press release</u> stated the "audit work is underway and is expected to complete in the first half of 2018"; the <u>February 28, 2018 press release</u> represented that the "audit … will commence quickly"; and the <u>April 25, 2018 press release</u> represented that Friedman "will continue to finalize

31

the [audit] project … over the coming months[.]"  A1569-70.  But these statements were false or misleading because Friedman had done no work on the audit in 2018, having stopped work in October 2017 because (as Findley knew) the auditor could not move forward until defendants addressed the various open items.  A701-02, A1569-70; *see also* A417.

Regarding materiality, the record demonstrates that the completion of the audit was important to investors for two related reasons.  *First*, it would provide investors with an auditor's independent assessment about the accuracy of Halitron's financials and the company's compliance with established accounting standards (A658), and the repeated representations that the audit was almost complete gave investors the false impression that the company's financials were in order.  *Second*, the completed audit (as Halitron repeatedly emphasized in the press releases) was a requirement for the uplist to a better trading platform, which Halitron at the start of the fraud announced would be critical for the company's future growth.  A1233 (May 12, 2017: "will open more doors for [Halitron], in terms of not only access to capital but also, an increasing number of future acquisitions"); *see also* A321.  The false claims about the audit's completion obscured from investors the uncertainty about Halitron's ability to uplist and, thus, obtain access to the additional investor funding that Findley had said was key to the company's success.  *See* A1233.

The challenged statements in the press releases are facially material. And in any event, the record demonstrates that investors did indeed consider the audit and its completion important (even though, as discussed above, materiality does not require actual reliance by investors). Findley admitted at trial that he had received at least 30 emails from investors complaining that the audit had not been completed, and an investor (Gary Tas) testified that information about the audit's completion was important to his investment decisions. A406, A831, A840-43.

Finally, the record demonstrates that Findley acted with scienter when making these false and misleading statements. Findley knew he had no basis for repeatedly representing that the audit would soon be completed. As detailed above, he was never given any assurance about the timing of the audit from the partner overseeing it, Findley knew both that not a single year of the audit had been completed and that the open items from June 2017 had never been fully addressed, and Findley's own emails conveyed his understanding that the audit was far from completion. Additionally, Findley's testimony demonstrates that he had a motive to make the false or misleading statements (*i.e.*, to increase investor interest in Halitron stock so the debt financiers would be willing to accept discounted shares that they could unload for a profit in exchange for loans to Halitron) and the opportunity (*i.e.*, debt financiers willing to make the debt-conversion loans and third-party promoters hired to publicly distribute the false

33

and misleading statements in a manner designed to target investors). A318-19, A339, A422-23.

> **b. The Commission demonstrated at trial that the six statements concerning the buyback program were materially false and made with scienter.**

As the district court detailed in the Remedies Order (relying on trial evidence and testimony), "each of the six press releases concerning the stock buyback program was misleading." A1566 (cleaned up). Defendants do not dispute that, as the district court described it, "[a]ll the press releases concerning the stock buyback program effectively said the same thing—that Halitron was engaged in a program to buyback Halitron shares in the open market." A1566. And as Findley admitted at trial, buyback programs are designed to increase shareholder value by decreasing the shares in circulation (A326-27); thus, when Halitron announced the stock buyback, Findley knew that investors would understand that the company was seeking to increase its share price (A327). *See also* A337 (Findley acknowledging that he wanted investors to understand that the buyback program was intended to get the share price up to a penny (or more) for the uplist). Indeed, four of the press releases expressly linked the buyback effort to the uplist requirement that the company's stock must trade at a penny for 30 days. A1242, A1249, A1254, A1258. But as detailed above (*see* Background § A(6), *supra*), the press releases did not disclose the meager size of the buyback program

(less than $3,500 spent to repurchase shares, *see* A337-38) or that it would involve just "a little over one-thousandth" of the 12 billion shares that Halitron was concurrently issuing to debt financiers and others (A338-42). *See also* A622-23. At bottom, the press releases touting the buyback program conveyed the false and misleading message that Halitron was working to increase share price to a penny when in fact Findley knew that could not happen given Halitron's dire financial situation and the ongoing stock dilution. A343-47; *see also* A622-27.

Moreover, the information about the buyback program was material to investors because it conveyed to them the message that the price would soon increase. A326-28. And the evidence at trial confirmed that investors found Halitron's statements about the buyback important. For example, an investor (Gary Tas) testified that the announcement about the buyback program encouraged him to stay invested in Halitron. A845-47, A851. Additionally, the Commission presented evidence of investors angrily emailing Findley when they realized the stock dilution was occurring. A351-53, A356-57, A383-84.

Finally, the trial record demonstrates that Findley acted with scienter. Findley knew the negative consequences of the massive stock dilution long before he issued the first press release about the buyback program. A343, A346. Indeed, Findley was expressly warned by a securities attorney that the press releases could not claim that the buyback program would increase shareholder value because the

35

ongoing stock dilution "will decrease shareholder value by its very nature." A344-45. And the jury's determination that defendants acted with scienter is further supported by the testimony demonstrating defendants' motive to engage in the fraud (*i.e.*, to provide debt financiers with an active market to dump their discounted shares) and defendants' opportunity (*i.e.*, debt financiers' willingness to lend to Halitron in exchange for discounted shares and Findley's retention of stock promoters willing to distribute the fraudulent press releases). *See* A1570-73.

### c.   None of defendants' contentions undermines the jury verdict.

Defendants raise a number of arguments to support their erroneous contention that the trial evidence failed to demonstrate any "untrue statements or omissions of material fact[.]" Br.7. *First*, defendants assert that there was "uncontroverted testimony" that "the stock buyback program was 'long term'" and the press releases "did not mention the timing or scope of the program." Br.30; *see also* Br.13. But as discussed above, Findley testified that the press releases were written to convey that the buyback program would raise the share price to a penny for the uplist to occur (A337) and the press releases explicitly stated that the uplist would be happening in the near term (*see, e.g.*, A-1242-43 (October 30, 2017: expressing intention to complete uplist requirements "by the end [of] the first quarter of 2018")).

*Second*, defendants assert that the press releases were not misleading about

36

the scope of the buyback program, the ongoing stock dilution, or the likely impact on the share price because "additional information had been disclosed" in quarterly "OTC Disclosures." Br.11, 45. But, critically, none of the quarterly reports that correspond with the period when defendants were issuing false and misleading press reports about the buyback (*i.e.*, October 2017-April 2018) were entered into evidence.[8] Moreover, Findley admitted at trial that Halitron's quarterly reports did not disclose the number of discounted shares being issued or when those were issued. (A370-72).[9]

*Third*, defendants appear to contend that the audit was "almost done" in July 2017 and that it was actually Halitron's acquisition of another distressed company in August 2017 (using deeply discounted Halitron shares (A313, A328, A338-39, A475, A511-12)) that subsequently caused the delay of the audit's completion.

---

[8] The only quarterly report that defendants entered into evidence was one issued on November 15, 2018 (*see* A848 (discussing trial exhibit 608)); that report has no relevance to what investors might have known during the fraud because it was issued approximately seven months *after* defendants' last fraudulent press release (in April 2018).

[9] Although the quarterly reports were not entered into evidence, the record does show that only one such report was even issued during the October 2017-April 2018 period when defendants were issuing the false and misleading press releases about the buyback program. *See* SEC-A8 (SEC demonstrative showing Halitron's share issuances relative to the dates of the quarterly reports). And that report covered only the last quarter of 2017 and was not released until February 28, 2018, after four of the false and misleading buyback press releases had already been issued. *See* SEC-A8; *see also* A888.

37

Br.19-20. But this ignores the testimony of the lead audit partner that the audit was delayed (and ultimately stopped) because defendants had failed (among other things) to address the critical open questions about the company's equity and other issues that were first raised in June 2017. A401-02, A681, A702.

*Fourth*, defendants insist that the representations were merely "forward-looking statements" that were not false or misleading when read in the context of the "safe harbor language" at the end of each press release. Br.30 n.7; *see also* Br.44. But this ignores the reality that most of the press releases involved demonstrably false and misleading statements of fact.[10] *See generally Omnicare, Inc., v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175, 185 (2015) (observing that even "sentences that begin with opinion words like 'I believe'" may contain within them "embedded statements of fact"). Even assuming any of the representations could be viewed as forward-looking statements about the audit or buyback program, they were still false and misleading

---

[10] *See, e.g.*, A1233 (May 12, 2017: "still on the path to" completing the uplist by mid-year); A1238 (July 24: 2017: "[w]ith the auditing process almost complete"); A1242 (October 30, 2017: announcing buyback without disclosing the 12 billion shares that diluted shareholder value); A1245 (Nov. 10, 2017: Halitron "now realizing a positive cash flow" which "will be utilized to buy back shares"); A1249 (January 22, 2018: "audit work is underway"); A1251 (February 6, 2018: announcing two buybacks without disclosing the meager amounts or the share dilution); A1254 (February 28, 2018: audit "will commence quickly"); A1257 (April 25, 2018: Friedman "will continue to finalize the [audit] … over the coming months").

because the trial evidence demonstrates that Findley had no basis for such beliefs and could not have genuinely held them. *See id.* at 184 (explaining that an expression of opinion "affirms one fact: that the speaker actually holds the stated belief"). And the generic cautionary language at the end of the press releases does not change the fact that the representations were false and misleading. *See, e.g.*, *P. Stolz Family Partnership L.P. v. Daum*, 355 F.3d 92, 96-97 (2d Cir. 2004) (explaining that present and historical "facts exist and are known, and a speaker may not disclaim those misrepresented facts with cautionary language").[11]

Defendants' attacks on the evidentiary basis for the jury's materiality findings also fail. Defendants broadly contend that the Commission presented "no evidence that a reasonable investor would have relied on the statements to trade, or that the statements would have significantly altered the 'total mix' of information available to investors." Br.44; *see also* Br.15, 17, 44. But this contention is irrelevant because a finding of materiality does not require proof of reliance, *see Litvak*, 889 F.3d at 65, and it is wrong because the challenged statements are facially material and, in any event, the Commission introduced sufficient evidence

---

[11]    For the same reason, defendants' contention that the jurors should have received an instruction about the cautionary language in the press release is meritless. Br.56. And in any event, the issue is forfeited because defendants did not raise it below (*see* A1055). *See, e.g.*, *Johnson v. New York Hospital et al.*, 96 F.3d 33, 34 (2d Cir. 1996).

to establish materiality, *see* Part I(A)(2)(a)-(b), *supra*.

Defendants advance two additional erroneous arguments about materiality. *First*, they contend that the testimony from an investor (Gary Tas) that he traded on June 6, 2017 notwithstanding his having some knowledge about the delayed audit and stock dilution somehow demonstrates that both facts were actually immaterial to investors. Br.15; *see also* Br.44. Yet Tas had no knowledge in early June 2017 of the extent to which the audit would be delayed, especially since Findley had announced the audit only the month before and stated that it would be completed in May or June 2017. And any dilution that had occurred by June 2017 (and that Tas might have known of) was minimal. *See* SEC-A8 (demonstrating that less than 300 million of the eventual 12 billion new shares had been issued); SEC-A9 (same). *Second*, defendants appear to contend that the materiality finding is somehow undermined by a lack of evidence that the "debt financiers loaned money to Halitron because of" the false and misleading statements (Br.14), but the Commission never claimed that the statements were directed at the financiers. *See, e.g.*, A1518-19 (explaining that the press releases were intended to promote investor liquidity so that the debt-financiers would have an active market to unload their discounted shares); A1524 (similar).

Finally, none of defendants' contentions undermine the evidentiary basis for the jury's scienter finding. Although defendants claim that their good faith is

40

demonstrated by the fact that some of the press releases were reviewed by a securities attorney before public dissemination, the undisputed evidence at trial confirmed that the attorney did not review the press releases for accuracy and that Findley knew this. *See* Background § A(4), *supra*; *see also* A541-42 (defendants did not pursue an "advice of counsel" defense at trial). Defendants also contend (at 43, 48, 53) that their good faith is demonstrated by the fact that the financial consultant Harmon reviewed some of the press releases, but this claim is similarly undermined by the uncontroverted testimony at trial that Harmon's review was limited to correcting grammatical errors. *See* Background § A(4), *supra*.

**B.  Defendants waived any contention that the district court erred by not including an instruction about the Commission's determination to drop the scheme liability claims, and, in any event, they have not shown any prejudice.**

The circumstances surrounding the Commission's decision, shortly before the jury began deliberating, not to pursue a subset of its claims demonstrate that defendants have waived their argument (Br.5-6; *see also* Br. 43, 54) that the district court committed reversible error when it did not instruct the jury about the withdrawn claims. *See Metropolitan Life Insurance Company v. Webb*, 2024 WL 3342449, at *1 (2d Cir. July 9, 2024) (explaining that "[w]aiver may be express or inferred from the parties' conduct").

The Commission's complaint alleged that defendants violated both the antifraud provisions' prohibitions on false and misleading misrepresentations

41

(Exchange Act Rule 10b-5(b); Securities Act § 17(a)(2)) and other broader prohibitions against fraudulent schemes (Rule 10b-5(a) & (c); Securities Act §§ 17(a)(1) & (a)(3)). *See generally* A285 (Commission's opening statement). As the Supreme Court has recognized, these prohibitions are not mutually exclusive, and the same conduct could violate all of them. *See Lorenzo v. SEC*, 587 U.S. 71, 77-83 (2019).

But during a telephonic status conference regarding the draft jury instructions the evening before the jury began its deliberations,[12] the district court "strong[ly]" encouraged the Commission to withdraw the so-called "scheme liability" claims because the court felt that they could be "potentially confusing and duplicative" of the false-and-misleading statement claims. A1060. The Commission agreed to do so but requested that the district court instruct defense counsel not to address the withdrawal in closing arguments. A1060. The next morning, only moments after agreeing to the jury instructions without asking for a specific instruction about the withdrawn claims (A807), defense counsel explained that he had "no intention" of addressing the Commission's determination not to pursue the scheme liability claims. A1060.

---

[12]    The transcript of the status conference is available at district court docket entry #127.

42

Under these circumstances, defendants should be deemed to have waived any request for a specific instruction about the withdrawn scheme liability claims. Defendants agreed that the court's proposed jury instructions were satisfactory, and they did so at a time when the Commission's withdrawal of the claims was front and center, yet they never sought any kind of instruction and knowingly relinquished their own ability to raise the matter during the closing argument. This constitutes the type of intentional abandonment of a known right that permanently extinguishes the ability to raise it on appeal. *See generally United States v. Polouizzi*, 564 F.3d 142, 153 (2d Cir. 2009) (holding that an appellant's agreement that an "instruction was satisfactory … waived the right to challenge the instruction on appeal").[13]

Moreover, defendants have not shown that they were prejudiced by the absence of a specific instruction. Nor could they. They contend that the scheme liability allegations "ascrib[ed] [a] sinister motive to them without any evidence." Br.6. But that contention ignores the substantial evidentiary overlap between the Commission's scheme liability claims and the false-and-misleading representation claims. Both sets of claims involved defendants defrauding investors to facilitate

---

[13]     Even if defendants had not forfeited the argument, they would be entitled only to plain error review because they failed to request a specific instruction. *See* FED. R. CIV. P. 51(d)(1)(B) & (2).

the debt-conversion transactions that Halitron needed to avoid bankruptcy.

Moreover, much of the evidence (and argument) relating to scheme liability and

the defendants' pattern of misconduct was relevant to scienter. *Cf. Old Republic*

*Nat. Title Ins. Co. v. McCain*, 545 Fed.Appx. 820, 825 (11th Cir. 2013) (stating

that "[s]cienter can properly be inferred from [a defendant's] numerous fraudulent

misrepresentations and omissions"). Thus, any references to defendants' "scheme"

during the trial could not realistically have ascribed a suggestion of an irrelevant,

unsupported bad motive here that somehow "confused the jury" (Br.5) in a way

that might have warranted a clarifying instruction.[14]

## II. The district court acted within its discretion in ordering remedies for defendants' fraud.

### A. The disgorgement award should be affirmed.

Defendants have not identified any basis for second-guessing the district

court's disgorgement award, which is well within its discretion under settled law.

*See generally First Jersey Securities, Inc.* ¸101 F.3d at 1474-75 (stating district

courts have "broad discretion" to determine whether disgorgement is appropriate).

---

[14] Defendants also appear to argue that the district court should have included "separate findings for the elements of falsity or materiality" in the verdict form. Br.22, 56. But defendants did not request this, and they have not demonstrated any prejudice. *See, e.g.*, *Simms v. Village of Albion*, 115 F.3d 1098, 1109 (2d Cir. 1997) ("A party who fails to object … to the substance of special verdict questions to be put to the jury has no right to object to those matters on appeal.").

*First*, defendants' argument that the district court "abused its discretion by … ordering disgorgement based on amounts loaned by financiers," (Br.49) fails both because a court may order disgorgement of "profits causally related to the fraud," *SEC v. Razmilovic*, 738 F.3d 14, 31-32 (2d Cir. 2013), and because it is not necessary that the ill-gotten gains have come directly from the harmed investors. *See, e.g., id.* at 32 (sustaining a disgorgement order of certain compensation, bonuses, and stock options that were awarded to the defendant based on the company's inflated performance report that resulted from the defendant's securities fraud on investors); *see generally* Exchange Act § 21(d)(7) (authorizing disgorgement "of *any* unjust enrichment by the person who received such unjust enrichment as a result of the securities law violation") (emphasis added)). Applying these principles, the district court acted well within its discretion in deeming the loans ill-gotten gains of defendants' fraud. The district court's findings in the Remedies Order establish the causal connection: defendants made the false and misleading statements "to spur investor interest"; as intended, this caused "a marked increase in trading volume," with "significant spikes in trading around the time of a number of the press releases at issue"; and this "[i]ncreased demand for Halitron's stock was necessary to attract debt financiers that would provide funding to Halitron in exchange for deeply discounted shares they could sell at a profit." A1570-72 (cleaned up).

45

*Second*, defendants erroneously contend that the court abused its discretion by allowing the Commission to modify its position about the feasibility of distributing disgorgement proceeds to harmed investors. *See* Br.48. Counsel for the Commission advised the court during the remedies hearing that it would not be feasible to direct disgorged ill-gotten gains to harmed investors because their "identity is unknown[.]" A1495. But at the close of the hearing, the court gave the parties the opportunity "to submit … whatever it is they want to supplement the record with," expressly stating the court was not "going to limit [the parties] there." A1529. And the court instructed that the parties' submissions should be "simultaneous in one month" but advised that if either side "fe[lt] compelled to offer something in response to the other side, let chambers know and we'll set a deadline for that." A1530-31. In response, the Commission made two filings on the due date. The first included an analysis from a Commission financial economist who explained that he was able to use the tax indicator codes from "Blue Sheets"—which are records of trade executions that the Commission obtained from broker-dealers—to identify 2,967 retail investors who suffered losses of approximately $1.69 million during the period of the fraud. SEC-A38-42 (¶¶6-16). The second submission advised the court that based on this additional staff analysis, "the Commission has concluded that a distribution is feasible." SEC-A44 (stating that at the court's request, the Commission would provide

46

"additional information on the Commission's feasibility determination"). Defendants have not shown how the district court abused its discretion by accepting and considering these submissions. Moreover, by not submitting a response, they forfeited any opportunity to challenge the Commission's supplemental analysis identifying the harmed investors.

*Finally*, defendants erroneously contend that it was an abuse of discretion for the court to order disgorgement because there was "insufficient evidence that [investors] suffered pecuniary harm as a result of the fraud." Br.49. *See SEC v. Govil*, 86 F.4th 89, 111 (2d Cir. 2023). This argument ignores: (1) the emails from investors complaining about the dilution of their stock holdings and about the ineffectual stock buyback program (A1573); (2) the testimony from the Gary Tas, whose "investment went to 'almost zero' … as a result of stock dilution" (A1574); and the above-referenced analysis from the Commission's financial economist. Indeed, defendants appear to concede in their opening brief that the stock dilution that was at the heart of the fraud harmed investors. *See* Br.50 (stating "investor 'loss' is likely most attributable to share dilution"); *see generally* A343-47 (Findley testimony concerning harmful effects stock dilution can have on investors).

47

**B.** **The civil penalties should be affirmed.**

Under Section 21(d)(3)(B)(iii) of the Exchange Act, a district court has discretion to impose third-tier civil penalties for a violation if (i) it "involved fraud" and (ii) "such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." Contrary to defendants' argument (Br.53-54), the district court acted well within its discretion in imposing such penalties because the record demonstrates that defendants committed fraud (*see* Part I(A), *supra*), which caused substantial losses to investors (*see* Part II(A), *supra*).

Further, there is no merit to defendants' argument that the district court somehow violated the Seventh Amendment of the U.S Constitution by "finding additional facts that should have been found by the jury, and ordering civil penalties[.]" Br.56-59. As a threshold matter, defendants have waived their contention that additional facts should have been found by the jury (and not the judge). Under Rule 49(a)(3) of the Federal Rules of Civil Procedure, "[a] party waives the right to a jury trial on any issue of fact raised by the pleadings of evidence not submitted to the jury unless, before the jury retires, the party demands its submission to the jury." Defendants have not identified any additional findings of fact that they requested the jury make, and the record demonstrates that they expressed satisfaction with the verdict instructions (A1055). Rule 49(a)(3) thus

48

makes it plain that the judge had authority to make any additional findings of fact that were necessary for the final judgment. *Id.* Indeed, defendants' counsel even advised the district court during the remedies hearing that "the [c]ourt has wide discretion to impose the remedies and that includes making the Court's own findings of fact in aid of the remedies order." A1514.

In any event, defendants are wrong in arguing that the Supreme Court's recent decision in *SEC v. Jarkesy*, 144 S. Ct. 2117 (2024), required the jury, not the judge, to decide civil penalties. Br.56-59. *Jarkesy* has no relevance here; it addresses whether the Seventh Amendment prohibits the Commission from pursuing certain types of claims "before the agency [in an administrative proceeding] rather than before a jury in federal court[.]" *Jarkesy*, 144 S. Ct. at 2124. *Jarkesy* does not address how the Seventh Amendment applies in federal court proceedings. Most relevantly, it does not alter the Supreme Court's holding in *Tull v. United States*, 481 U.S. 412, 427 (1987), that, under the Seventh Amendment, a defendant's "demand for a jury trial [should] be granted to determine his liability, but the trial court and not the jury should determine the amount of penalty, if any." *Cf. generally Jarkesy*, 144 S.Ct. at 2127, 2128-30, 2136-37 (stating that the Court's "analysis follows the approach" in *Tull* and citing *Tull* approvingly a dozen times).

49

### C.   The injunctive relief should be affirmed.

The district court reasonably concluded that evidence in the record demonstrated a reasonable likelihood of future violations of the securities laws warranting the permanent injunction.   Br.52.  Defendants' argument to the contrary (Br.53-54) repeats their meritless challenge to the sufficiency of the evidence supporting the findings of wrongdoing, which fails for the reasons discussed in Part I(A), *supra*.  Applying the factors identified in *SEC v. Cavanaugh*, 155 F.3d 129, 135 (2d Cir. 1998), the district court reasonably concluded that there is a reasonable likelihood that defendants would violate the securities laws in the future in the absence of a permanent injunction.  *See* A1586-88 .

Findley also erroneously contends that the district court abused its discretion in imposing the four-year bar from acting as an officer or director of an issuer of securities, and the four-year bar from participating in an offering of penny stock. Br.52.  *See SEC v. Patel*, 61 F.3d 137, 144 (2d Cir. 1995) (stating that district court have "substantial discretion" when deciding on professional bars).  Findley does not contend that the district court applied the wrong legal standard.  *See* A1588-89 (applying the factors identified in *Patel*, 61 F.3d at 144, for determining whether a professional bar is appropriate).  Rather, Findley appears to contend that the district court should have afforded dispositive weight to one factor, specifically,

50

Findley's status as a "first-time offender." Br.53. But the relevant standard contemplates that this factor be weighed against other relevant factors, which is what the district court did, finding that the other factors generally counseled "in favor of the imposition of industry bars" and, weighing all the factors together, "conclude[d] that temporary, rather than permanent, industry bars are appropriate." A1589. That determination was well within the court's substantial discretion and Findley has identified nothing to demonstrate otherwise.

## CONCLUSION

Accordingly, this Court should affirm the district court's final judgment.

Respectfully submitted,

MICHAEL A. CONLEY
Solicitor

 /s/ *William K. Shirey*
WILLIAM K. SHIREY
Counsel to the Solicitor

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-5043 (Shirey)

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains approximately 11,815 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

I also certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface—Times New Roman, 14 point—using Microsoft Word.

/s/ *William K. Shirey*

William K. Shirey

October 8, 2024

**CERTIFICATE OF SERVICE**

I certify that on October 8, 2024, I electronically filed the foregoing Brief of the Securities and Exchange Commission, Appellee, with the Clerk of Court for the United States Court of Appeals for the Second Circuit using the Court's appellate ACMS filing portal.  Further, I certify that I will provide six copies of this brief to the Clerk's Office.  Finally, I also electronically served Appellants' counsel using the ACMS filing portal.

/s/ *William K. Shirey*
William K. Shirey